**SWEET HOME CHAPTER OF COMMUNITIES FOR A GREAT OREGON, et al., Appellants,**

v.

**Bruce BABBITT, Secretary of Interior, et al.**

No. 92–5255.

United States Court of Appeals, District of Columbia Circuit.

Aug. 12, 1994.

John A. MacLeod, with whom Steven P. Quarles and Thomas R. Lundquist, Washington, DC, were on the brief, for appellants.

Ellen J. Durkee, Attorney, Dept. of Justice, with whom Martin W. Matzen and Jean E. Williams, Attorneys, Dept. of Justice, Washington, DC, were on the brief, for appellees.

Before: MIKVA, Chief Judge; WILLIAMS and SENTELLE, Circuit Judges.

## ORDER

PER CURIAM.

Upon consideration of appellees' petition for rehearing, the response thereto, and the reply, it is

ORDERED, by the Court, that the petition is denied.

Chief Judge MIKVA would grant the petition for rehearing and joins in the statement by Circuit Judge SILBERMAN dissenting from the Court's denial of appellees' suggestion for rehearing *en banc.*

A statement of Circuit Judge WILLIAMS, joined in by Circuit Judge SENTELLE, is attached.

Before: MIKVA, Chief Judge, WALD, EDWARDS, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, and ROGERS, Circuit Judges.

## ORDER

PER CURIAM.

Appellees' suggestion for rehearing *en banc,* the response thereto, and the reply, have been circulated to the full Court. The taking of a vote thereon was requested. Thereafter, a majority of the judges of the Court in regular active service did not vote in favor of the suggestion. Upon consideration of the foregoing, it is

ORDERED, by the Court *en banc,* that the suggestion is denied.

Chief Judge MIKVA and Circuit Judges WALD, SILBERMAN, and ROGERS would grant the suggestion for rehearing *en banc.*

Separate statement filed by Circuit Judge SILBERMAN, dissenting from the denial of rehearing *en banc.*

STEPHEN F. WILLIAMS, Circuit Judge.

In seeking rehearing, the government offers a number of ill-founded critiques of the panel opinion, 17 F.3d 1463 (D.C.Cir.1994).

1. The government suggests broadly that the panel found the harm regulation, 50 C.F.R. § 17.3, invalid on the basis of false assumptions as to its meaning. See Petition for Rehearing and Suggestion for Rehearing En Banc 6–9. Specifically, the government contends that the panel (a) disregarded the regulation's requirement that the habitat modification involve "affirmative action which creates death or disturbance to essential behavioral patterns with significant and permanent, injurious effects", Petition at 8, and (b) manifested its misunderstanding of the regulation by referring to third parties' claims made about necessary grizzly bear habitat, *id.* at 8–9.

It is the government that misrepresents the regulation. The Department of Interior in fact requires no "affirmative action." Quite the contrary. The Department carefully specified that there was no need to refer expressly to *omissions* because the text as a whole made clear that omissions were embraced as fully as acts of commission. *Final Redefinition of "Harm"*, 46 Fed.Reg. 54,748, 54,750 (Nov. 4, 1981) ("the phrase 'or omission' was deleted since the Service feels that 'act' is inclusive of either commissions or omissions which would be prohibited by section 9"). The Department inserted the word "actually" before "kills or injures" in its redefinition of harm merely to underscore the need for a causal link—a showing that the "significant and permanent effects" on the species have been "due to a party's actions." *Id.* at 54,749.

Further, the grizzly example cited in the text, 17 F.3d at 1465, makes quite clear that the panel understood that the regulation addressed habitat modifications that would be *fatal* to members of the species. It refers to a contention that " 'as many as 35 million to 42 million acres of land are *necessary to the survival* of grizzlies' ". *Id.* (emphasis added). If that habitat is "necessary to [the grizzlies'] survival", then any material curtailment must involve death for members of the species.[1]

---

1. Equally clearly, the panel did not endorse the specific claim of what acreage may actually be "necessary".

2. The government argues that the panel misstated the legislative history when it suggested a parallel between the ban on habitat modification *retained* in the Act as applied to federal government actors, 17 F.3d at 1466, and the "habitat modification" explicitly *deleted* from the draft provision governing private actors, *id.* at 1467. See Petition at 8. The panel made the point both in noting the apparent structure of the Act (contrasting the imposition of "very broad burdens" on a narrow segment of society, the federal government, and relatively narrow burdens on all others), and in suggesting the significance of the Senate Committee's deletion of the bill's reference to "habitat modification" as one of the ways in which a person might "take" members of an endangered species. The suggested parallelism is false, says the government, because the statutory ban on habitat modification by federal agencies is far broader, reaching such modifications "whether destruction of the habitat would actually kill or injure the species". Petition at 8.

Again the government misrepresents. The panel quoted the provision applying to the government, "destruction or adverse modification of habitat . . . which is determined . . . to be *critical*", § 7(a)(2), Endangered Species Act, 16 U.S.C. § 1536(a)(2) (emphasis added) (quoted in 17 F.3d at 1466). The statute in turn defines "critical habitat" in terms of characteristics *"essential* to the conservation of the species", 16 U.S.C. § 1532(5)(A)(i) & (ii) (emphasis added), which seems to be simply another way of referring to habitat modifications so significant to the species that they might lead to death (or at least some very serious injury) for members of the species. In looking at the Department's regulations discussing modifications of "critical" habitat under § 7, and habitat modifications that are forbidden under the Department's view of § 9, we are unable to discern any substantive, operational difference, and the government has not identified any. Compare, e.g., 50 CFR § 17.94 (regulations implementing § 7 preclude "destruction or adverse modification of the constituent elements *essential to conservation* of the listed species") (emphasis added) with 46 Fed. Reg. 54,748, 54,750 ("[t]o be subject to section 9, the modification or degradation must

be *significant,* must *significantly impair essential* behavioral patterns, and must result in *actual* injury to a protected wildlife species") (emphasis in original). If there are "essential" habitat elements whose removal or destruction causes no injury, the government cites no example and it is hard to imagine one. Michael Bean, Senior Counsel for the Environmental Defense Fund, recognized the virtual identity between what the Senate deleted from § 9 and what it retained in § 7 when he wrote, not long after the Act passed, "if 'taking' comprehends habitat destruction, then it is at least doubtful whether Section 7 of the Act is even necessary." Michael J. Bean, *The Evolution of National Wildlife Law* 397 (1977). But see Michael J. Bean, *The Evolution of National Wildlife Law* 342 (Revised & Expanded Edition 1983).

To the extent that there may be some theoretical difference between habitat modification under § 7 and under the Department's regulations purporting to implement § 9, practical realities limit its role to pure theory. As noted in the panel opinion, § 10(a) authorizes the advance issuance of permits for "incidental taking". 17 F.3d at 1467–68. As a practical matter, persons whose intended conduct might be found a "take", and who thus are exposed to the criminal penalties of 16 U.S.C. § 1540(b) (see also 18 U.S.C. §§ 3559(a)(6), 3571(b) & (e)), are under commanding pressure to comply with § 10(a) plans. The Department recognizes this reality. "Much of the private land which would be covered by the long-term HCP [habitat conservation plan] cannot be developed due to the prohibitions of section 9 of the Act. In order for many planned development projects to proceed in compliance with the Act, a permit for incidental take must be obtained." *Notice of Intent to Prepare an Environmental Impact Statement to Allow Incidental Take of the Threatened Desert Tortoise (Gopherus agassizii) Under Section 10(a)(1)(B) of the Endangered Species Act and Notice of Public Meetings,* 59 Fed.Reg. 5439 (Feb. 4, 1994). And the Department explicitly recognizes the restrictions that it imposes under § 10(a) as "equivalent" to those it imposes under § 7 to protect "critical habitat". See *Special Rule Concerning Take of the Threat-*

*ened Coastal California Gnatcatcher*, 58 Fed. Reg. 65,088, 65,089–90 (Dec. 10, 1993) (taking permitted under § 10(a) plan for California gnatcatcher "will not appreciably reduce the likelihood of survival and recovery of the gnatcatcher in the wild. This criterion is *equivalent* to the regulatory definition of 'jeopardy' under section 7(a)(2) of the Act") (emphasis added).[2]

3. To the extent that the government seeks to convey the impression that its enforcement of the harm regulation never entails the exercise of power over large tracts of land, the impression is false. The Department's § 10(a) plans, into which § 9 collapses de facto, are often sweeping. The plan to protect the California gnatcatcher, for example, covers 3.8 million acres. *Special Rule Concerning Take of the Threatened Coastal California Gnatcatcher*, 58 Fed.Reg. at 65,090.

\*　　\*　　\*

The government faults the panel for failing to specify whether the regulation's excess of statutory authority failed under the first or second "step" of the analysis set forth in *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), Petition at 9–10, and in a more general way for failing to give the agency the deference that is its due under *Chevron*. Because the court in determining whether Congress "unambiguously expressed" its intent on the issue, see 467 U.S. at 843, 104 S.Ct. at 2781, is to employ all the "traditional tools of statutory construction", *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987), the factors involved in the first "step" are also pertinent to whether an agency's interpretation is "reasonable". Thus the exact point where an agency interpretation falls down may be unclear. (Indeed, the *Chevron* Court itself never specified which step it was applying at any point in its analysis, see 467 U.S. at 859–66, 104 S.Ct. at 2790–93.)

Nonetheless, we conclude that the statute, fairly read in the light of the "traditional tools of statutory interpretation", manifests a clear determination by Congress that the prohibitions of § 9 should not reach habitat modifications as defined by the Department, where there is no direct action by the defendant against any member of the species. Extending the word "harm" to reach habitat modification as so conceived carries § 9's prohibition far beyond the reach effected by all the other terms used in the definition; it applies to every citizen duties the Act expressly imposed only on federal government agencies; and it ignores the plausible inferences from the Senate's deletion of the phrase "habitat modification" from the draft bill. The extension vests the Department with authority to supervise the use of privately owned land in vast tracts of the United States, even to the point of forbidding modest clearing efforts conducted in the interest of fire protection in populated areas. See *Determination of Threatened Status for the Coastal California Gnatcatcher*, 58 Fed. Reg. 16,742, 16,753 (March 30, 1993); *Determination of Endangered Status for the Delhi Sands Flower-loving Fly*, 58 Fed.Reg. 49,881, 49,884–86 (Sept. 23, 1993) (destruction of species habitat by removal of native vegetation for fire prevention on private land could be interpreted to constitute take); (fly "rare to absent" in former habitat sites currently "degraded by ongoing soil disturbances, caused by grading, plowing, discing to remove vegetation for fire control, and off-road vehicle use", *id.* at 49,884/3–85/1; destruction of habitat "could be interpreted to constitute take", *id.* at 49,886/2). Congress clearly did not hang so massive an expansion of government power on so slight a nail as § 9's provision that no one should "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" an endangered species.

The petition for rehearing is

*Denied.*

---

**2.** Technically the restrictions were under § 4(d) of the Act, 15 U.S.C. § 1533(d), because the gnatcatcher is not an endangered but a "threatened" species. But the Department by regulation has made the anti-take provisions fully applicable to threatened species, so the rule in effect implements § 9 (through the lens of § 10(a)). See *Sweet Home Chapter v. Babbitt*, 1 F.3d 1, 5–8 (1993).

SILBERMAN, Circuit Judge, dissenting from the denial of rehearing *en banc*, with whom MIKVA, Chief Judge, and WALD, Circuit Judge, join:

I find this case quite troublesome, as much for what is not argued by the parties, and therefore not discussed by the court, as for what is. Keeping in mind that we are dealing with a criminal statute, I am not at all sure that *Chevron* even governs our review. *Cf. United States v. Thompson/Center Arms Co.,* — U.S. —, — & nn. 9 & 10, 112 S.Ct. 2102, 2110 & nn. 9 & 10, 119 L.Ed.2d 308 (1992) (plurality opinion). That is to say, the *Chevron* presumption—that Congress has delegated to the administrating agency primary authority to reconcile ambiguities in statutory language—may not apply when the statute contemplates criminal enforcement. *Cf. Kelley v. EPA,* 15 F.3d 1100, 1007 (D.C.Cir.1994). The petitioner does not raise that concern, but it surely is not a separate claim that the petitioner has affirmatively waived.

It is, therefore, not necessary in order to direct briefing on that question to rely on *United States Nat'l Bank v. Independent Ins. Agents, Inc.,* — U.S. —, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), in which the Supreme Court proclaimed unrestrained judicial discretion to decide any issue analytically anterior to the controversy before it, even if the plaintiff affirmatively waived the claim (which means, I gather, in the typical contract breach suit where both parties agree that the contract was formed but dispute only whether there was a breach, a federal court *can, sua sponte,* force the parties to litigate whether the contract was actually formed). Since the Court did not even purport to announce a rule governing this sort of discretion (which some might think implies that its opinion on this issue is not even law), I take it that no federal judge is bound to exercise the discretion that the Supreme Court obviously wished to preserve for itself.[1]

Indisputably, however, ripeness issues which go to our jurisdiction should be raised by a federal court *sua sponte,* and I rather doubt the ripeness of the appellant's facial challenge to the Department of Interior regulation. I can imagine a string of hypotheticals which range from "habitat modifications" that are sufficiently close to the core concept that the majority believes animates the statutory language as to be surely included within the word "harm" to ones that seem clearly inconsistent with the statute. Suppose, for example, that someone wished to kill all the birds on a particular piece of property and could do so by draining a marsh. If that person did so, would not his actions properly be thought to "harm" the endangered species?

Assuming the challenge to the regulation is ripe and that *Chevron* controls our review, I think the Chief Judge has the better of the argument. Were I interpreting this statute without deference, given its language and legislative history, I would certainly be troubled about any construction that might preclude a landowner from using his property for ordinary purposes just because it could be thought that an endangered species was somehow disadvantaged. I do not think, however, that the majority has submitted to the discipline of the *Chevron* framework and given the Department of Interior its due deference. It was certainly not apparent whether the majority's initial opinion rested on *Chevron* Step I or Step II. In its response to the government's petition for rehearing, the panel majority appears to shift perceptibly to a Step I "clear determination by Congress," against which no deference to the agency's interpretation is appropriate. I do not find in either the statutory language or the legislative history any such fixed view. And at the second step (which is where I would analyze the case), maxims of statutory construction like *noscitur a sociis,* although not totally irrelevant, certainly have less force. *See Michigan Citizens for an Indep. Press v. Thornburgh,* 868 F.2d 1285, 1292–93 (D.C.Cir.), *aff'd per curiam by an equally divided court,* 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989). I quite agree with the panel that "the factors involved in the first

---

1. It has recently been suggested that the Supreme Court is really a quasi-judicial institution. *See* Thomas W. Merrill (the John Paul Stevens Professor at Northwestern), *A Modest Proposal For a Political Court,* 17 Harv.J.L. & Pub.Pol'y, 137, 139 (1994).

'step' are also pertinent to whether an agency's interpretation is 'reasonable,' " *see* Silberman, Chevron—*The Intersection of Law & Policy,* 58 GEO.WASH.L.REV. 821, 827 (1990); but when thinking of the statute at that second step, one must assume that the statute has more than one plausible construction as it applies to the case before you. If the agency offers one—it prevails.

In any event, the issue would seem of sufficient importance, particularly in light of the circuit split, *cf. Palila v. Hawaii Dep't of Land and Natural Resources,* 852 F.2d 1106 (9th Cir.1988), to warrant *en banc* treatment.