**AMERICAN MINING CONGRESS, et al., Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants,**

**and**

**National Wildlife Federation, et al., Defendant–Intervenors.**

**Civil Action No. 93–1754 SSH.**

United States District Court, District of Columbia.

Jan. 23, 1997.

**268**

Albert J. Beveridge, III, David Gary Isaacs, Thomas C. Jackson, Virginia S. Albrecht, Beveridge & Diamond, Washington, DC, for American Mining Congress/American Road & Transp. Builders Assoc./National Aggregates Assoc./Nat'l Assoc. of Home Builders.

Alice Love Mattice, DOJ, Environment & Natural Resources Div., Washington, DC, for U.S. Army Corps of Engineers/Edward Dickey, Acting Assist. Sec. of Army for Civil Works/Arthur E. Williams, Chief of Engineers/Environmental Protection Agency.

Howard I. Fox, Sierra Club Legal Defense Fund, Washington, DC, for National Wildlife Federation/North Carolina Wildlife Federation/Nat'l Audubon Society/Sierra Club.

Ronald A. Zumbrun, Pacific Legal Foundation, Washington, DC, for Fairness to Landowners/Pacific Legal Foundation C'ee/National Associat of Flood and Stormwater Mgt.—movant.

Paul Douglas Kamenar, Washington Legal Foundation, Washington, DC, for Washington Legal Foundation—amicus.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for summary judgment, defendant-intervenors' motion for summary judgment, defendants' cross-motion for summary judgment, the parties' replies thereto, and plaintiffs' and defendants' submissions of supplemental authority. The Court also has considered the *amicus curiae* briefs filed by the National Association of Flood and Stormwater Management Agencies, the Fairness to Landowners Committee and the Pacific

Legal Foundation, the Washington Legal Foundation, and a coalition of the Nationwide Public Projects Coalition, the Metropolitan Water Providers and Participants of Greater Denver, the City of Colorado Springs, Colorado, and the New England Water Works Association.[1] Upon consideration of the entire record, the Court grants summary judgment to plaintiffs and denies summary judgment to defendants and defendant-intervenors. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," Fed.R.Civ.P. 52(a), the Court, having analyzed the parties' submissions so carefully, nonetheless sets forth its analysis.

### Background

Congress passed § 404 of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1344, in 1972, authorizing the United States Army Corps of Engineers (the "Corps") to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Pursuant to this authority, the Corps and the United States Environmental Protection Agency (the "EPA") (collectively, "the agencies") adopted regulations and issued guidance documents that have regulated the disposal of dredged materials in waters.[2] Until the rule at issue here became effective, however, the agencies did not regulate under § 404 excavation activities that involved the removal of material from waters, such as landclearing, ditching, and channelization, even if those activities might have adversely impacted wetlands or waters. Under the instant rule, the agencies now regulate removal activities because they consider the "incidental fallback" that accompanies dredging to be a "discharge" under § 404.

The rule, referred to as the *Tulloch* rule, is an outgrowth of a settlement agreement in *North Carolina Wildlife Federation v. Tulloch,* Civil No. C90–713–CIV–5–BO (E.D.N.C.). In that case, a North Carolina developer used sophisticated techniques, such as welding shut openings in equipment to prevent more than incidental fallback, and using dump trucks to transport soil removed by backhoes, to develop 700 acres of wetlands without a § 404 permit. Environmental groups sued the Corps, the EPA, and two landowners, alleging that those landclearing and excavation activities destroyed and degraded wetlands and therefore should be subject to regulation under § 404. The agencies settled the case by agreeing, in relevant part, to revise:

> The term "discharge of dredged material" [to] include[ ], without limitation, any addition or redeposit of dredged materials, including excavated materials, into waters of the United States which is incidental to any activity (except normal dredging operations as defined below), including mechanized landclearing, ditching, channelization, or other excavation, which has or would have the effect of destroying or degrading any area of waters of the United States. The term does not include de minimis soil movement incidental to any activity which does not have or would not have the effect of destroying or degrading any area of waters of the United States. Moreover, the term does not include de minimis incidental soil movement occurring during normal dredging operations, defined as dredging to maintain, deepen, or extend navigation channels in the navigable waters of the United States, as defined in 33 C.F.R. Part 329, with proper authorization from the Congress/and or the Corps.

---

**1.** The Court also has studied the transcript of the hearing on the motions for summary judgment that was conducted before the Honorable John H. Pratt on March 16, 1995. Before he could decide the case, Judge Pratt became ill, and died in August 1995. Thereafter, the case was reassigned back to the undersigned (along with a high percentage of Judge Pratt's other cases). That necessitated the undersigned's starting from the beginning of what Judge Pratt had aptly characterized as "literally pounds and pounds of papers." Motions tr. at 56. Fitting this case and

its voluminous pleadings into the undersigned's already crowded schedule inevitably resulted in regrettable delay.

**2.** Although the Corps has primary responsibility for issuing permits, it administers the § 404 program jointly with the EPA. Both agencies are empowered to issue binding regulations and guidance documents. *See, e.g.,* 33 U.S.C. § 1344(b)(1).

Pls.' Br. in Support of Their Mot. for Summ. J.Ex. A, Settlement Agreement at 3 (underlining omitted). Pursuant to this agreement, the agencies proposed the rule and, after a 60–day comment period, adopted a final rule that mirrors the language in the settlement agreement.[3]

Under this new rule, the agencies have redefined the term "discharge of dredged material" to include small-volume incidental fallback. 33 C.F.R. § 323.2(d)(1)(iii) (Corps regulations) and 40 C.F.R. § 232.2(1)(iii) (EPA regulations). Incidental fallback is the incidental soil movement from excavation, such as the soil that is disturbed when dirt is shoveled, or the back-spill that comes off a bucket and falls back into the same place from which it was removed.[4] Because incidental fallback is almost always associated with excavation and land clearing, and because this soil movement is considered a discharge, a § 404 permit is now required for mechanized landclearing, ditching, channelization, or other excavation.

The *Tulloch* rule altered the agencies' previous policy to focus on the environmental effect of the activity resulting in the discharge, rather than on the size of the discharge. It creates a rebuttable presumption that shifts the burden to the regulated party to show, prior to commencing the project, that the federal government does not have jurisdiction over the activity. 33 C.F.R. § 323.2(d)(3)(i) and 40 C.F.R. § 232.2(3)(i). In order to show that the activity does not fall under § 404, the party must show that the activity associated with the discharge has de minimis environmental effects. *Id.*

Plaintiffs challenge the *Tulloch* rule on four grounds, contending that the rule (1) is inconsistent with the language and intent of the CWA; (2) is arbitrary, capricious, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, because it exempts navigational dredging, which is generally done by the Corps, and exempts landclearing from a grandfather clause; (3) violates plaintiffs' due process rights under the Fifth Amendment to the Constitution because it (a) is vague, and (b) shifts to regulated parties the burden of showing that their activities are not covered; and (4) was promulgated in violation of the procedural requirements of the APA. Defendants and intervenor-defendants counter these arguments in their motions for summary judgment and contend that the rule merely closes a nearly 20–year-old "loophole" in the Act. Because the Court grants summary judgment to plaintiffs on the ground that the *Tulloch* rule is inconsistent with the language and intent of the Act, the Court does not address the remainder of the parties' claims.

Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because the issues raised by the present motions

---

3. The *Tulloch* rule does not regulate mere removal activities; a discharge to waters of the United States is "an absolute prerequisite" to the assertion of § 404 jurisdiction. 58 Fed.Reg. at 45,011. As the Corps itself has stated, however, "[d]redging operations cannot be performed without some fallback." 51 Fed.Reg. 41,210. While the agencies declined to make a finding in the final rule that landclearing and excavation activities in waters always result in a "discharge," they warned project proponents that they proceeded at the risk of violating the rule because, in the agencies' view, small-volume incidental fallback "unavoidably accompan[ies] ... excavation operations." 58 Fed.Reg. 45,013. Consequently, the effect of the rule is essentially to bring all dredging and landclearing activities within the ambit of § 404.

The Court observes that the *Tulloch* rule effectively exempts the Corps' own navigational dredging from the § 404 permit requirement.

The rule exempts "incidental movement of dredged material occurring during normal dredging operations," which the rule defines as "dredging for navigation in navigable waters of the United States ... with proper authorization from the Congress or the Corps." 33 C.F.R. § 323.2(d)(3)(ii) and 40 C.F.R. § 232.2(3)(ii) (underlining omitted). While this exception theoretically applies to any party, most dredging projects for navigation purposes are conducted by or at the behest of the Corps.

4. Incidental fallback does not include soil movements away from the original site. "Sidecasting," which involves placing removed soil alongside a ditch, and sloppy disposal practices involving significant discharges into waters, have always been subject to § 404. 58 Fed.Reg. at 45,013.

concern only questions of law, this matter is appropriate for resolution on summary judgment.

The parties frame the case differently. Plaintiffs contend that Congress never intended for incidental fallback to be within the ambit of § 404. They contend that the Act was crafted to regulate the disposal of dredged soil in waters, but that the *Tulloch* rule extends federal regulation to the act of removing material from waters. They view the concept of "incidental fallback" as creating a jurisdictional hook by which the agencies can regulate excavation and landclearing activities that are otherwise not within the scope of the § 404 permit program.

The agencies contend that they are empowered to regulate incidental fallback and that the Court must defer to their expertise. They contend that such fallback has always been regulated but has been excepted from the permit requirement pursuant to a narrow exception for de minimis discharges. They contend that the *Tulloch* rule merely closes a loophole in the Act, thus effectuating the goals of the Act, and argue that the agencies have appropriately applied their de minimis authority.[5]

*Standard of Review*

In evaluating the parties' arguments, the Court follows the rules laid down in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). First, the Court looks to "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Only if the statute is ambiguous does a court defer to an agency's interpreta-

tion of the statute.[6]  *Id.* at 843, 104 S.Ct. at 2781–82.

In discerning whether Congress has addressed a particular issue, a court must "employ[ ] traditional tools of statutory construction." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. As our Court of Appeals has stated:

> In determining whether Congress has so spoken [to the precise question at issue], we must look to 'the particular statutory language at issue, as well as the language and design of the statute as a whole,' and we must employ the traditional tools of statutory construction, including, where appropriate, legislative history.

*Chemical Mfrs. Assn. v. United States Envtl. Protection Agency,* 919 F.2d 158, 162 (D.C.Cir.1990) (citations omitted).

■ Upon consideration of the entire record, the Court holds that the agencies unlawfully exceeded their statutory authority in promulgating the *Tulloch* rule. Accordingly, the rule is invalidated and set aside (as to both agencies).

*Analysis*

As mentioned above, § 404(a) of the Act provides, in relevant part, that the Corps "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The Act defines a "discharge" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutants" include "dredged spoil."[7]  33 U.S.C. § 1362(6). The "discharge of any pollutant by any person" is unlawful except in compliance with, *inter alia,* § 404 of the Act. 33 U.S.C. §§ 1311(a) ("§ 301(a)") and 1344.

---

5. Under the de minimis doctrine, the agencies have the authority to provide exceptions from regulation when the burdens of regulation yield, at most, a trivial value. *Alabama Power Co. v. Costle,* 636 F.2d 323, 360–61 (D.C.Cir.1979). The doctrine, however, does not empower the agencies to exceed the scope of their authority when regulation would be beneficial. *Id.* at 360 (doctrine "is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design"). Because the Court holds that the Act does not authorize the

agencies to regulate incidental fallback, their discussion of the de minimis doctrine is irrelevant.

6. A court does not defer to the agency in determining whether a statute is ambiguous. *See Cajun Elec. Power Coop., v. FERC,* 924 F.2d 1132, 1136 (D.C.Cir.1991).

7. The Court observes that, while the definition of "pollutant" includes "dredged spoil," § 404 refers to "the discharge of dredged or fill material."

The *Tulloch* rule defines the term "discharge of dredged material" to include incidental fallback. 33 C.F.R. § 323.2(d)(1)(iii) and 40 C.F.R. § 232.2(1)(iii). The agencies contend that the authority to regulate incidental fallback is included in their § 301(a) authority to regulate all discharges of pollutants. Plaintiffs contend that the term "addition of a pollutant" does not include incidental fallback. Thus, the issue in this case is whether the incidental fallback that accompanies landclearing and excavation activities is (1) the discharge of dredged material, *i.e.*, the addition of a pollutant, (2) at specified disposal sites.

### 1. Incidental Fallback Is Not the "Addition of a Pollutant"

Plaintiffs contend that by defining a "discharge" to mean an "addition," Congress intended to regulate only the introduction or placement of dredged material into water, and not the incidental fallback that accompanies the removal of material from waters. Defendants contend that they can regulate incidental fallback under § 301 but, prior to the *Tulloch* rule, simply chose not to exercise that authority under the de minimis doctrine. The Court concludes that neither § 301 nor § 404 covers incidental fallback.

The agencies argue that the term "addition of pollutants" is ambiguous and therefore that the Court should defer to the agencies' interpretation of that term to include incidental fallback. The agencies cite to a line of cases holding that "additions" can include "redeposits" of dredged material from the

same general area.[8] *See* Def.'s Mem. of P. & A. in Support of its Mot. for Summ.J. at 27–30. None of these cases, however, addresses the issue here, *i.e.*, whether incidental fallback from excavation activities constitutes a discharge.[9] Defendants contend that these cases are still relevant because those courts deferred to the agencies' interpretation of "addition of a pollutant."

In *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983), the court found that reading "addition" to include "redeposit" was consistent with the purposes and legislative history of the Act. 715 F.2d at 923. Thus, any deference by that court was predicated on the court's holding that that reading was consistent with Congress' intent. In contrast, because this Court holds that Congress did not consider incidental fallback as the addition of a pollutant, deference would not be appropriate.

■ The Court bases on several grounds its holding that Congress did not intend to cover incidental fallback under § 404. First, § 404 refers to "discharges" but does not refer to the regulation of excavation or dredging activities; the fact that Congress has specifically referred to excavation activities elsewhere is evidence that Congress did not intend to regulate these activities under § 404. In § 10 of the Rivers and Harbors Appropriation Act of 1899, Congress made it unlawful "to excavate or fill" any point or harbor without Corps authorization.[10] 33 U.S.C. § 403. " 'Where a statute with respect to one subject contains a given provi-

---

8. Some of the cases that defendants cite involve redeposit of dredged materials on immediately adjacent areas, while others involve redeposit in the same general area.

9. The cases all involve substantial redeposits. For example, in *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983), the court observed that "the activities in this case did not involve a 'de minimis' disturbance; hence we have no reason to determine whether de minimis disturbances are exempted from the Act." 715 F.2d at 923 n. 41. Significantly, that court also noted that, "[a]fter persistent questioning at oral argument, the federal defendants explained further that, in their view, if the vegetation was cut down without significant disturbance of the soil and then removed to dry land, no permit would be required." *Id.* at n. 40.

10. Section 404 of the CWA is properly understood as just one part of Congress' approach to environmental protection. As the General Counsel of the Army explained in a pre-*Tulloch* law review article, § 404 "addresses only 'the addition' of dredged material [and] does not cover slop over from dredging operations." This is because there are "two separate statutory frameworks. Section 10 of the 1899 Act covers the act of dredging, while Section 404 covers the disposal of the dredged material." Ablard and O'Neill, *Wetland Protection and Section 404 of the Federal Water Pollution Control Act Amendments of 1972: A Corps of Engineers Renaissance*, 1 Vt.L.Rev. 51, 93 (1976).

sion, the omission of such a provision from a similar statute is significant to show a different intention existed.'" *Richerson v. Jones,* 551 F.2d 918, 928 (3d Cir.1977) (citation omitted); *see also Moore v. Sun Bank of North Florida,* 923 F.2d 1423, 1428 (11th Cir.1991), *reh'g granted and opinion vacated,* 953 F.2d 1274 (11th Cir.1992), *opinion reinstated,* 963 F.2d 1448 (11th Cir.1992). Had Congress intended to regulate excavation activities under § 404, it would have done so expressly.

■ Second, although Congress did not specifically mention incidental fallback in 1972 or 1977, there are statements that indicate that Congress thought that "discharge" had a very definite meaning. Specifically, Congress understood "discharge of dredged material" to mean open water disposal of material removed during the digging or deepening of navigable waterways. *See, e.g.,* S.Rep. No. 92–1236, 92d Cong., 2d Sess. 141–42 (1972), U.S.Code Cong. & Admin.News 1972, at p. 3668, (Report of the Conference Committee), *reprinted in* A Legislative History of the Clean Water Act of 1972 (hereinafter "1972 Leg.Hist.") at 324–25; Senate Consideration of the Report of the Conference Committee, 92d Cong., *reprinted in* 1972 Leg.Hist. at 177–78; H.R.Rep. No. 92–911, 92d Cong., 2d Sess. 129–30, *reprinted in* 1972 Leg.Hist. at 816–17; Senate Debate on S. 2770, *reprinted in* 1972 Leg.Hist. at 1386–90 (colloquy between Senators Ellender, Muskie, and Stennis) (Sen. Stennis observed that "dredge material . . . has a very definite meaning"). The 1977 Senate Report confirmed that "Congress intended that section 404 in the 1972 act would in its initial implementation end the open water disposal of dredge spoil." S.Rep. No. 77–370, 95th Cong., 1st Sess. 68 (1977), U.S.Code Cong. & Admin.News, 1977, pp. 4326, 4393, *reprinted in* A Legislative History of the Clean Water

Act of 1977 (hereinafter "1977 Leg.Hist.") at 701.

This understanding of "discharge" excludes the small-volume incidental discharge that accompanies excavation and landclearing activities. Senator Muskie explained that "the bill tries to free from the threat of regulation those kinds of manmade activities which are sufficiently de minimis as to merit general attention at the State and local level and little or no attention at the State and local level and little or no attention at the national level." Senate Report on S. 1952, 95th Cong., *reprinted in* 1977 Legis.Hist. at 645. Senator Domenici stated that "we never intended under section 404 that the Corps of Engineers be involved in the daily lives of our farmers, realtors, people involved in forestry, anyone that is moving a little bit of earth anywhere in this country that might have an impact on navigable streams." Senate Debate, *id.* at 924.

■ In common dredging practices, excavation is followed by the disposal of dredged material at another location. Thus, Congress understood the "discharge of dredged material" to involve the moving of material from one place to another. During the 1972 debates, Senator Ellender stated: "The disposal of dredged material does not involve the introduction of new pollutants; it merely moves the material from one location to another."[11] Senate Debate on S. 2770, 92d Cong., *reprinted in* 1972 Leg.Hist. at 1386. Incidental fallback associated with excavation or landclearing does not add material or move it from one location to another; some material simply falls back in the same general location from which most of it was removed. Congress' use of the term "specified disposal sites" underscores this reading as it conveys Congress' understanding that discharges would result in the relocation of

---

11. The agencies contend that the 1972 legislative history is "'rendered virtually meaningless'" by the 1977 Act. Defs.' Mem. of P. & A. in Support of Cross–Motion for Summ.J. at 20 n. 16 (*quoting Avoyelles,* 715 F.2d at 916). This Court finds otherwise. The 1977 amendments added several provisions to § 404, but left unaltered the language of § 404(a), which established the program to regulate discharges of dredge or fill material, as well as § 404(b), § 404(c), § 301, and § 502. Congress' amendment of related

provisions of a statute does not constitute evidence of the intent of Congress with respect to provisions that are not amended; the Court must look to the Congress that passed the provision in question in order to assess its intent. *See Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 17 F.3d 1463 (D.C.Cir.1994), *reh'g denied,* 30 F.3d 190 (D.C.Cir.1994), *rev'd on other grounds,* ── U.S. ──, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

material from one site to another.[12] *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* ─── U.S. ───, ───, 115 S.Ct. 2407, 2415, 132 L.Ed.2d 597 (1995) ("a word 'gathers meaning from the words around it'") (citation omitted).

Third, Congress, through its lack of amendment, ratified 18 years of agency and judicial interpretation that excluded incidental fallback from § 404. Until the issuance of the *Tulloch* rule, the agencies took the position that § 404 applied to disposal, not removal, activities.[13] The agencies' prior regulations defining "discharge of dredged material" stated that this term "does not include *de minimis*, incidental soil movement occurring during normal dredging operations." 33 C.F.R. § 323.2(d) (1992); 40 C.F.R. § 232.2(e) (1992). The *Federal Register* notice for the Corps' 1986 regulations stated:

> Section 404 clearly directs the Corps to regulate the *discharge* of dredged material, not the dredging itself. Dredging operations cannot be performed without some fallback. However, if we were to define this fallback as a "discharge of dredged material," we would, in effect, be adding the regulation of dredging to section 404 which we do not believe was the intent of Congress.

51 Fed.Reg. 41,210 (1986) (emphasis in original); *see also* Pls.' Mot. for Summ.J.Ex. B, A.R., Group 5, No. 1 (RGL 81–4 at ¶ 2) (Section 404 "does not authorize the Corps to regulate dredging in [waters of the United States]. *De minimis* discharge occurring during normal dredging operations, such as the drippings from a dragline bucket, is not considered to be a Section 404 discharge."). In determining whether an activity is subject to regulation under § 404, the Corps looked to the intent behind the activity:

> The purpose of dredging is to remove material from the water, not to discharge material into the water.... If the intent is to remove material from the water and the results support this intent, then the activity involved must be considered as a "normal dredging operation" that is not subject to section 404.

51 Fed.Reg. at 41,210.

Similarly, the caselaw suggests that the Act does not authorize the agencies to regulate incidental fallback. In *Salt Pond Assocs. v. United States Army Corps of Eng'rs,*[14] 815 F.Supp. 766 (D.Del.1993), the court held that landclearing and excavation activities were outside the reach of § 404.[15] *Id.* at 778 ("the reach of the CWA extends only to the *discharge* of pollutants into navigable waters and not the excavation or

---

12. *See* discussion, *infra*, at part 2.

13. Agencies are, of course, permitted to revise their interpretations. *Rust v. Sullivan,* 500 U.S. 173, 184–88, 111 S.Ct. 1759, 1767–70, 114 L.Ed.2d 233 (1991); *see also United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The agencies contend that their reinterpretation is warranted in light of their increased experience. However, courts do not defer to agency reinterpretations that exceed the scope of the agency's authority; as with the *Chevron* doctrine generally, courts defer to agency interpretations only when the statute is ambiguous. *See Rust,* 500 U.S. at 184–88, 111 S.Ct. at 1767–70.

An additional reason for rejecting the agencies' request for heightened deference is the inconsistency of positions they have taken. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.'" *Immigration and Naturalization Service v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). The agencies con-

tend that their increased experience with the harmful environmental effects of excavation and landclearing activities provides a "reasoned analysis for the change," *see Texas Rural Legal Aid v. Legal Servs. Corp.,* 940 F.2d 685, 690 (D.C.Cir. 1991), but it is not apparent to the Court how this experience would alter the agencies' interpretation of congressional intent.

14. Although *Salt Pond* was decided before the *Tulloch* rule had been finalized, it is still good authority for the proposition that the agencies lack authority to regulate excavation activities, as it relied on both statutory and regulatory grounds. *See* 815 F.Supp. at 778, 782.

15. In a subsequent opinion, the court found that the landowner's activities were regulated because they "extended well beyond excavation resulting in only *de minimis*, incidental fallback." The court, however, reaffirmed its earlier holding that excavation is not subject to § 404. *See Salt Pond Assocs. v. United States Army Corps of Eng'rs,* 1993 WL 738478 at 9 (D.Del. September 22, 1993).

dredging activities that occur in section 404 wetlands") (emphasis in original). The court held that "such an expansive reading of this regulation is manifestly inconsistent with the jurisdictional limits of the CWA's grant of authority for Government regulation of fill activities (and not excavation activities)." *Id.* at 782.

In *United States v. Lambert*, 18 Env't Rep.Cas. (BNA) 1294, 1981 WL 14886 (M.D.Fla.1981), *aff'd*, 695 F.2d 536 (11th Cir. 1983), the court stated that back-spill from excavation "does not ... constitute the dis-

charge of a pollutant [under the Act], when the dredged spoil simply falls back into the area from which it has just been taken. Such an event cannot reasonably be considered to be the addition of a pollutant." [16] *Id.* at 1296. The only case to consider incidental fallback to be a regulated discharge is *Reid v. Marsh*, 20 Env't Rep.Cas. (BNA) 1337, 1342, 1984 WL 178396 (N.D.Ohio 1984).[17] That case, however, limited the Corps' jurisdiction to the "discharge" itself; the Corps was not authorized to regulate the entire dredging activity.[18] *Id.* at 1342.

16. Although *Lambert* was decided prior to the *Tulloch* rule, it remains good authority as its analysis was based on statutory grounds.

17. The Court notes that the agencies expressly rejected that interpretation in the 1986 regulations.

18. Under the *Tulloch* rule, a party who wishes to avoid the § 404 permit requirement has the burden of demonstrating that the landclearing or excavation activity does not have "the effect of destroying or degrading an area of waters of the United States." 33 C.F.R. § 323.2(d)(3)(i), 40 C.F.R. § 232.2. The regulation thus focuses on the environmental effects of the activity resulting in the discharge, rather than on the discharge itself. *See, e.g.,* 58 Fed.Reg. at 45,019. Thus, incidental fallback that may have little or no effect on waters becomes a means through which the agencies may invoke § 404 jurisdiction over otherwise unregulated activities.

Plaintiffs contend that the Act was never intended to provide comprehensive protection from all adverse impacts to wetlands and other waters, and thus that the *Tulloch* rule's focus on the effects of activities is inconsistent with the Act. *Cf. Save Our Community v. United States Envtl. Protection Agency,* 971 F.2d 1155, 1162–67 (5th Cir.1992) (holding that § 404 does not regulate wetlands in the absence of a regulated discharge, regardless of the harm to the wetlands); *Minnehaha Creek Watershed Dist. v. Hoffman,* 597 F.2d 617, 626–27 (8th Cir.1979) (holding that a significant alteration in water quality is not a prerequisite to the regulation of a discharge of dredged or fill material). These cases indicate that environmental impacts play no role in determining the scope of regulation. Statements made during the debates confirm that Congress intended for the agencies to regulate discharges, but not the dredging *per se. See, e.g.,* Senate Debate on S. 2770, 92d Cong., *reprinted in* 1972 Leg.Hist. at 1388 (statement of Senator Muskie).

In a related context, our Court of Appeals has rejected a similar unjustified regulatory overreaching. In *Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency,* 859 F.2d 156 (D.C.Cir.1988), the court held that EPA cannot "transmogrify its obligation to regulate

discharges into a mandate to regulate the plants or facilities themselves. To do so would unjustifiably expand the agency's authority beyond its proper perimeters." *Id.* at 170; *see also Natural Resources Defense Council, Inc. v. United States Envtl. Protection Agency,* 822 F.2d 104, 129 (D.C.Cir.1987) (CWA does not confer permitting authority over the construction of facilities); *New Hanover Township v. United States Army Corps of Eng'rs,* 796 F.Supp. 180, 186 (E.D.Pa.1992) (Corps jurisdiction limited to effects of filling of wetlands, not impacts of construction of a landfill of which filling activity was a small part), *vacated on other grounds,* 992 F.2d 470 (3d Cir. 1993). As mentioned above, even in *Reid,* 20 Env't Rep.Cas. at 1337, where the court held that § 404 permits the agencies to regulate incidental fallback, the court stated that the authority to regulate discharges does not permit the Corps to regulate associated dredging activity. That court held that:

§ 404 ... does not give the Corps authority to regulate the actual deepening and widening of the channel (*i.e.,* the dredging *per se*).... [S]uch activities may be governed only by § 10 of the Rivers and Harbors Appropriations Act. Rather, § 404 gives the Corps power to regulate the dredging work only to the extent that it constitutes a "discharge of dredged material." Therefore, in processing an application for the channelization project the Corps should evaluate only the effect of discharge resulting from the dredging activities and not the ultimate effect of proposed channel modification.

*Id.* at 1342.

The agencies, nonetheless, contend that this effects-based test for determining the scope of regulation is consistent with the Act. For support, they refer the Court to the § 404(f)(2) "recapture" provision, which directs the agencies to consider effects in limiting the extent to which otherwise regulated discharges are removed from jurisdiction, and § 404(e), which directs the Corps to consider the effects of the activity when issuing general permits for regulated activities. In neither case, however, are effects used to regulate activities that *do not themselves* constitute discharges; neither does either provision indicate that Congress in 1977 intended to ex-

Although the Act has been amended several times since it was enacted, Congress has not modified the longstanding administrative interpretation. " 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.' " *Public Citizen v. FAA,* 988 F.2d 186, 194 (D.C.Cir.1993) (citation omitted).

Fourth, there have been several proposals in recent years to expand the scope of regulated activities under § 404, and Congress has not passed any of them.[19] This indicates (1) that the question of whether fallback should be regulated under § 404 "is a significant policy question presently under profound consideration throughout the relevant Governmental agencies and the legislative branch," *Salt Pond,* 815 F.Supp. at 779 n. 38; *see also* Senate Debate on Conference Report (statement of Sen. Baker), *reprinted in* 1977 Leg.Hist. at 523 ("most of the important provisions in [the Act] are hard fought compromises"), and (2) that Congress believes that § 404 does not currently authorize the agencies to regulate excavation and other activities, even when accompanied by incidental fallback.[20] "That there is comprehensive

debate surrounding the issue in the legislature indicates to the Court that the Government clearly does *not* possess the expanded jurisdiction it has asserted here." *Salt Pond,* 815 F.Supp. at 779 n. 38 (emphasis in original); *see also Keene Corp. v. United States,* 508 U.S. 200, 217–18 and 217–18 n. 14, 113 S.Ct. 2035, 2045–46 and 2045–46 n. 14, 124 L.Ed.2d 118 (1993) (rejecting litigant's argument that, if accepted, would have achieved the result that Congress had declined to enact).

Defendants contend that the § 404(f) exemptions cover activities that are analogous to the excavation and landclearing activities performed by plaintiffs, and thus demonstrate that Congress believed that excavation and landclearing activities are subject to the permit requirement, but simply did not provide a § 404(f) exemption for plaintiffs.[21] Section 404(f), however, does not expand the scope of regulated activities.[22] Consequently, the absence of an exemption for plaintiffs is unremarkable. *See Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617, 626 (8th Cir.1979) ("[i]t is obvious that an exemption . . . would be necessary only if such work is generally subject to § 404 per-

pand the meaning of "discharge of dredged material."

**19.** For example, H.R. 1330, the Hayes Bill, would regulate "drainage, channelization, and excavation." S. 1304, the Baucus-Chafee Bill, would regulate "any addition of dredged or fill material into navigable waters incidental to any activity that . . . has or would have the effect of destroying or degrading any area of navigable waters." Other bills are broader in scope: the Edwards Bill, H.R. 350, would expand the scope of regulated activities to include any "other alteration of navigable waters"; the Studds Bill, H.R. 3465, would require a permit for "any significant disruption of wetlands."

**20.** The Court observes that a White House press release announcing the *Tulloch* rule stated: "Congress should amend the Clean Water Act to make it consistent with the agencies' rulemaking." Pls.' Mot. for Summ.J.Ex. I, White House Office on Environmental Policy, "Protecting Americas Wetlands: A Fair, Flexible, and Effective Approach" at 23 (Aug. 24, 1993). The executive branch, however, is supposed to administer laws enacted by Congress, not, in effect, to legislate and then seek ratification of its action by Congress.

**21.** In the 1977 amendments to the Act, Congress responded to "the perceived problem of overregulation by the Corps" by exempting certain discharges associated with farming and forestry activities from the § 404 permit requirement, subject to "recapture" if certain adverse environmental effects resulted. *Riverside Bayview Homes,* 474 U.S. at 135–36, 106 S.Ct. at 463–64 (1985); 33 U.S.C. § 1344(f)(1) and (f)(2).

**22.** Even while adding § 404(f), Congress maintained its belief that the small-volume incidental fallback that accompanies excavation is not sufficient to trigger § 404. Senator Muskie observed during the 1977 Senate debates that "drainage could be performed without discharging dredged or fill material in water" and thus would not be regulated. 123 Cong.Rec. part 21 at 26,767 (August 4, 1977). Defendants contend that this statement addressed the issue of drainage in uplands; however, the Court finds that the statement, which responded to a question about farmers' draining a "low-lying area," did not concern uplands. *See id.* Moreover, Senator Muskie plainly contemplated this drainage occurring in covered areas, as he stated that such drainage could be performed without discharge *"or would occur"* in areas that are not within the ambit of § 404. *Id.* (emphasis added).

mitting requirements"). Section 404(f) exempts the otherwise regulated discharges, such as sidecasting, that result from normal farming, silviculture, and ranching activities. Neither the language and structure of the Act nor the legislative history provides any basis for concluding that Congress intended to depart from its 1972 intent.[23]

> To suggest, as the [agencies] effectively do[ ], that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power ..., is both flatly unfaithful to the principles of administrative law ... and refuted by precedent.... Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

*Oil, Chemical and Atomic Workers, Int'l Union AFL–CIO v. NLRB*, 46 F.3d 82, 90 (D.C.Cir.1995) (citation omitted); *see also Ethyl Corp. v. Envtl. Protection Agency*, 51 F.3d 1053, 1060 (D.C.Cir.1995).

The agencies also point out that the broad purpose of the Act is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also United States v. Riverside Bayview Homes*, 474 U.S. 121, 133, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985) (finding a "breadth of congressional concern for protection of water quality and aquatic ecosystems" that justified the Corps' broad reading

of "waters of the United States" to include adjacent wetlands). They contend that the Court should strive to effectuate this broad directive by validating their exercise of jurisdiction over incidental fallback.[24] There are two problems with this argument. First, courts look to the general purposes of a statute in interpreting a provision only when Congress' intent is not clear. *Ethyl Corp.*, 51 F.3d at 1060 n. 9. Moreover, even if the Court were to look at the broad purposes of the Act, such objectives do not translate into a congressional delegation of unrestricted authority to the agencies.[25] The Supreme Court has stated that:

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam) (emphasis in original); *see also Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986). Second, the agencies may not disregard the specific environmental protection scheme Congress has created, *see Ethyl Corp.*, 51 F.3d at 1060 n. 9.; specifically, § 10 of the Rivers and Harbors Act cov-

---

**23.** The Senate Report noted that "[l]ittle contained in the study of the Commission could be construed as justifying major change in the direction established in 1972." Senate Report on S. 1952, 95th Cong., *reprinted in* 1977 Legis.Hist. at 635.

**24.** Defendants cite *Minnehaha*, 597 F.2d at 625, for the proposition that "pollutant" is defined broadly in keeping with "far-reaching objectives of the Act." In that case, however, the materials the court found to be "pollutants" were explicitly listed as such in 33 U.S.C. § 1362(6), and the court simply held that the addition of these enumerated pollutants was subject to § 404 regardless of whether they created a significant alteration in water quality. *Id.* at 625–26.

**25.** The broad objectives of the Act are to be achieved "consistent with the provisions of this

Act." 33 U.S.C. § 1251(a). The legislative history suggests that Congress did not intend to leave much discretion to the agencies. In Senate debate on the conference report, Senator Randolph stated:

> Congress has become very specific on the steps it wants taken with regard to environmental protection. We have written into law precise standards and definite guidelines on how the environment should be protected. We have done more than just provide broad directives for administrators to follow.

Senate debate on S. 2770, 92d Cong., *reprinted in* 1972 Leg.Hist. at 1272. Senator Pastore stated: " 'It is necessary to define such materials [as pollutants] so that litigable issues are avoided over the question of whether the addition of a particular material is subject to control requirements.' " *Id.* at 1265 (quoting the Committee Report at p. 76).

ers the act of dredging, while § 404 covers the disposal of the dredged material.

### 2. Excavation Sites Are Not "Specified Disposal Sites"

■ Even if the term "addition of a pollutant" were broad enough to cover incidental fallback, the Court would still hold that the *Tulloch* rule departs from Congress' intent that the material must be discharged at a "specified disposal site." The repetition of the idea of "specified disposal sites," as well as the structure of § 404, indicates that the site must have been affirmatively selected as a disposal site by the agencies.[26] It also conveys Congress' understanding that "discharges" would result in the relocation of material from one site to another.

Section 404 authorizes the Corps to issue permits for the discharge of dredged material "at specified disposal sites." 33 U.S.C. § 1344(a). Section 404(b) requires "disposal sites" to be "specified" under permits issued by the Corps. *Id.* at § 1344(b). Similarly, under § 404(c), the EPA may "prohibit the specification ... of any defined area as a disposal site" or "deny or restrict use of defined area ... as a disposal site." *Id.* at § 1344(c).

The *Tulloch* rule makes the term "specified disposal site" superfluous; under the rule, all excavation sites are considered "specified disposal sites." This strained reading results in excavation activities involving two disposal sites: the site of excavation, and the place where the dredged material is disposed of. Under the plain meaning rule, "[i]n the absence of a 'clearly expressed legislative intention to the contrary,' the language of a statute itself 'must ordinarily be regarded as conclusive.'" *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (citation omitted); *see also United States v. Nordic Village, Inc.*, 503 U.S. 30, 35–36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) (statutes must "be construed in such fashion that every word has some operative effect").

### Conclusion

Defendants promulgated the *Tulloch* rule to close a longstanding alleged loophole in the Act. They contend that "a total exclusion of landclearing and excavation activities involving incidental discharges would mean that waters of the United States could be destroyed and degraded without ... any federal environmental review." Defs.' Mot. for Summ.J. at 24. The appropriate remedy for what the agencies now perceive to be an imperfect statute, however, is Congressional action; defendants' authority is limited to adopting regulations that effect the will of Congress as expressed in the statute. *Board of Governors*, 474 U.S. at 374, 106 S.Ct. at 688–89; *Friends of Sakonnet v. Dutra*, 738 F.Supp. 623, 633 (D.R.I.1990) (it is Congress' responsibility "to correct any defects that may be present in the law"). The Court finds that the *Tulloch* rule exceeds the scope of the agencies' statutory authority and, accordingly, declares it invalid and sets it aside. An appropriate Judgment accompanies this Opinion.

### JUDGMENT

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiffs' motion for summary judgment is granted. It hereby further is

ORDERED, that defendants' motion for summary judgment is denied. It hereby further is

ORDERED, that defendant-intervenors' motion for summary judgment is denied. Consistent therewith, it hereby further is

ORDERED, that the so-called *Tulloch* rule is declared invalid and set aside, and henceforth is not to be applied or enforced by the Corps of Engineers or the Environmental Protection Agency.

**SO ORDERED.**

---

**26.** This reading of Congress' understanding is confirmed by the language of another statutory provision. In 1976, Congress instructed the Corps to utilize management practices "to extend the capacity and useful life of dredged material disposal areas such that the need for new dredged material disposal areas is kept to a minimum." 33 U.S.C. § 419a.