United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 9, 1998 Decided June 19, 1998

 No. 97-5099

 National Mining Association, et al., 

 Appellees

 v.

 U.S. Army Corps of Engineers, et al., 

 Appellants

 Consolidated with

 No. 97-5112

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 93cv01754)

 Ronald M. Spritzer, Attorney, U.S. Department of Justice, 
argued the cause for the federal appellants. With him on the 
briefs were Lois J. Schiffer, Assistant Attorney General, 


David C. Shilton, Alice L. Mattice, Attorneys, and Steven 
Neugeboren, Counsel, U.S. Environmental Protection Agency.

 Howard I. Fox argued the cause and filed the briefs for 
appellants National Wildlife Federation, et al.

 Virginia S. Albrecht argued the cause for appellees Nation-
al Mining Association, et al. With her on the brief were Gary 
J. Smith and Harold P. Quinn, Jr.

 Lawrence R. Liebesman, Robin L. Rivett, M. Reed Hopper, 
Robert J. Saner, II, and Nancie G. Marzulla were on the 
brief for amici curiae City of Colorado Springs, Colorado, et 
al.

 Tom Udall, Attorney General, State of New Mexico, Al-
letta Belin, Assistant Attorney General, Winston Bryant, At-
torney General, State of Arkansas, J. Joseph Curran, Jr., 
Attorney General, State of Maryland, Jeremiah W. Nixon, 
Attorney General, State of Missouri, Joseph P. Mazurek, At-
torney General, State of Montana, Frankie Sue Del Papa, 
Attorney General, State of Nevada, W.A. Drew Edmondson, 
Attorney General, State of Oklahoma, William H. Sorrell, 
Attorney General, State of Vermont, and Christine O. Gre-
goire, Attorney General, State of Washington, were on the 
brief for amici curiae State of New Mexico, et al.

 Before: Silberman, Williams and Sentelle, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Concurring opinion filed by Circuit Judge Silberman.

 Williams, Circuit Judge: Section 404 of the Clean Water 
Act (the "Act") authorizes the United States Army Corps of 
Engineers (the "Corps") to issue permits "for the discharge of 
dredged or fill material into the navigable waters at specified 
disposal sites." 33 U.S.C. s 1344. Section 301(a) of the Act 
provides that the "discharge of any pollutant by any person" 
is unlawful unless in compliance with Act's permit require-
ments, including those of s 404. Id. s 1311(a). "Discharge," 


in turn, is defined as "any addition of any pollutant to 
navigable waters from any point source." Id. s 1362(12).

 In 1986 the Corps issued a regulation defining the term 
"discharge of dredged material," as used in s 404, to mean 
"any addition of dredged material into the waters of the 
United States," but expressly excluding "de minimis, inciden-
tal soil movement occurring during normal dredging opera-
tions." 51 Fed. Reg. 41,206, 41,232 (Nov. 13, 1986). In 1993, 
responding to litigation, the Corps issued a new rule remov-
ing the de minimis exception and expanding the definition of 
discharge to cover "any addition of dredged material into, 
including any redeposit of dredged material within, the 
waters of the United States." 33 CFR s 323.2(d)(1) (empha-
sis added). Redeposit occurs when material removed from 
the water is returned to it; when redeposit takes place in 
substantially the same spot as the initial removal, the parties 
refer to it as "fallback." In effect the new rule subjects to 
federal regulation virtually all excavation and dredging per-
formed in wetlands.

 The plaintiffs, various trade associations whose members 
engage in dredging and excavation, mounted a facial chal-
lenge to the 1993 regulation, claiming that it exceeded the 
scope of the Corps's regulatory authority under the Act by 
regulating fallback. The district court agreed and granted 
summary judgment for the plaintiffs. American Mining 
Congress v. United States Army Corps of Engineers, 951 
F. Supp. 267 (D.D.C. 1997). The district court also entered 
an injunction prohibiting the Corps and the Environmental 
Protection Agency, who jointly administer s 404, from enforc-
ing the regulation anywhere in the United States. Id. at 278. 
We affirm.

 * * *

 The Act sets up two independent permitting systems. See 
33 U.S.C. s 1311(a). Section 402 authorizes EPA (or state 
agencies in some circumstances) to issue National Pollutant 
Discharge Elimination System ("NPDES") permits to control 
the discharge of wastewater into navigable waters. Section 
404, the provision at issue in this case, authorizes the Corps, 


with EPA oversight, to issue permits "for the discharge of 
dredged or fill material into the navigable waters at specified 
disposal sites." Id. s 1344(a).1 At the time of the Act's 
passage in 1972, the Corps already had jurisdiction over 
navigational dredging under Section 10 of the Rivers and 
Harbors Act of 1899, 33 U.S.C. s 403.

 For the purposes of the Act, the phrase "navigable waters" 
has been construed to include wetlands. United States v. 
Riverside Bayview Homes, 474 U.S. 121, 131-32 & n.8 (1985) 
(upholding as not unreasonable an interpretation by the 
Corps that the Act is applicable to wetlands "adjacent to but 
not regularly flooded by rivers, streams, and other hydro-
graphic features more conventionally identifiable as 'wa-
ters' ").2 Wetlands, in turn, are defined by the Corps as 
areas "inundated or saturated by surface or ground water at 
a frequency and duration sufficient to support, and that under 
normal circumstances do support, a prevalence of vegetation 
typically adapted for life in saturated soil conditions." 33 
CFR s 328.3(b). The United States Fish and Wildlife Ser-
vice estimated that as of the 1980s there were 104 million 
acres of wetlands in the contiguous United States--about five 
percent of the total land surface of the lower 48 states. T.E. 
Dahl, Wetlands Losses in the United States 1780's to 1980's 5 
(U.S. Fish & Wildlife Service 1990). (Because so much of 
Alaska is wetlands by the prevailing definition, the proportion 
rises to twelve percent if all 50 states are included.) Id. The 
plaintiffs assert that seventy-five percent of wetlands in the 
United States are privately owned. Plaintiffs' Br. at 6.

__________
 1 The challenged regulation does not address discharge of "fill 
material," which the Corps defines as "any material used for the 
primary purpose of replacing an aquatic area with dry land or of 
changing the bottom elevation of an [sic] waterbody." 33 CFR 
s 323.2(e).

 2 Compare United States v. Wilson, 133 F.3d 251, 257 (4th Cir. 
1997) (holding that regulations purporting to reach wetlands whose 
degradation or destruction "could affect" interstate or foreign com-
merce were beyond statutory authorization because they would 
"include intrastate waters that need have nothing to do with naviga-
ble or interstate waters.").


 In 1977 the Corps promulgated regulations that generally 
tracked the statutory language, defining "discharge of 
dredged material" as "any addition of dredged material into 
the waters of the United States," with a few limited excep-
tions. 42 Fed. Reg. 37,145 (July 19, 1977). A new regulation 
issued in 1986 exempted from the permit requirement "de 
minimis, incidental soil movement occurring during normal 
dredging operations." 51 Fed. Reg. at 41,232. Although this 
regulation did not define "normal dredging operations," its 
preamble gave some guidance as to the exemption's coverage:

 Section 404 clearly directs the Corps to regulate the 
 discharge of dredged material, not the dredging itself. 
 Dredging operations cannot be performed without some 
 fallback. However, if we were to define this fallback as a 
 "discharge of dredged material," we would, in effect, be 
 adding the regulation of dredging to section 404 which 
 we do not believe was the intent of Congress.

Id. at 41,210. The parties agree that the 1986 rule did, 
however, regulate "sidecasting," which involves placing re-
moved soil in a wetland but at some distance from the point of 
removal (e.g., by the side of an excavated ditch). See 58 Fed. 
Reg. 45,008, 45,013/3 (Aug. 25, 1993) (noting that sidecasting 
has "always been regulated under Section 404.").

 The 1993 rulemaking under challenge here was prompted 
by a lawsuit, North Carolina Wildlife Federation v. Tulloch, 
Civ. No. C90-713-CIV-5-BO (E.D. N.C. 1992), concerning a 
developer who sought to drain and clear 700 acres of wetlands 
in North Carolina. See 58 Fed. Reg. at 45,016. Because the 
developer's efforts involved only minimal incidental releases 
of soil and other dredged material, the Corps's field office 
personnel determined that, under the terms of the 1986 
regulation, s 404's permit requirements did not apply. Envi-
ronmental groups, concerned by what they viewed as the 
adverse effects of the developer's activities on the wetland, 
filed an action seeking enforcement of the s 404 permit 
requirement. As part of the settlement of the Tulloch case (a 
settlement to which the developer was not a party), the two 
administering agencies agreed to propose stiffer rules govern-


ing the permit requirements for landclearing and excavation 
activities. The result--the regulation at issue here--has 
come to be called the "Tulloch Rule."

 As mentioned above, the Tulloch Rule alters the preexist-
ing regulatory framework primarily by removing the de min-
imis exception and by adding coverage of incidental fallback. 
Specifically, the rule defines "discharge of dredged material" 
to include "[a]ny addition, including any redeposit, of 
dredged material, including excavated material, into waters of 
the United States which is incidental to any activity, including 
mechanized landclearing, ditching, channelization, or other 
excavation." 33 CFR s 323.2(d)(1)(iii) (emphasis added).3

 The Tulloch Rule does have its own de minimis exception, 
but it is framed in terms of the Act's overall goals. A permit 
is not required for "any incidental addition, including redepos-
it, of dredged material associated with any activity that does 
not have or would not have the effect of destroying or 
degrading an area of waters of the United States." 33 CFR 
s 323.2(d)(3)(i). Persons engaging in "mechanized landclear-
ing, ditching, channelization and other excavation activity," 
however, bear the burden of proving to the Corps that their 
activities would not have destructive or degrading effects. 
Id. Degradation is defined as any effect on the waters of the 
United States that is more than de minimis or inconsequen-
tial. Id. s 323.2(d)(5). Thus, whereas the 1986 rule exempt-
ed de minimis soil movement, the Tulloch Rule covers all 
discharges, however minuscule, unless the Corps is convinced 
that the activities with which they are associated have only 
minimal adverse effects. In promulgating the new rule the 
Corps "emphasize[d] that the threshold of adverse effects for 
the de minimis exception is a very low one." 56 Fed. Reg. at 
45,020.

 It is undisputed that by requiring a permit for "any 
redeposit," 33 CFR s 323.2(d)(1)(iii) (emphasis added), the 
Tulloch Rule covers incidental fallback. According to the 
agencies, incidental fallback occurs, for example, during 

__________
 3 EPA promulgated a parallel rule, which is codified at 40 CFR 
s 232.2(1)(iii).


dredging, "when a bucket used to excavate material from the 
bottom of a river, stream, or wetland is raised and soils or 
sediments fall from the bucket back into the water." Agen-
cies' Br. at 13. (There is no indication that the rule would not 
also reach soils or sediments falling out of the bucket even 
before it emerged from the water.) Fallback and other 
redeposits also occur during mechanized landclearing, when 
bulldozers and loaders scrape or displace wetland soil, see 58 
Fed. Reg. 45,017-18, as well as during ditching and channeli-
zation, when draglines or backhoes are dragged through soils 
and sediments. See id. at 45,018. Indeed, fallback is a 
practically inescapable by-product of all these activities. In 
the preamble to the Tulloch Rule the Corps noted that "it is 
virtually impossible to conduct mechanized landclearing, 
ditching, channelization or excavation in waters of the United 
States without causing incidental redeposition of dredged 
material (however small or temporary) in the process." Id. at 
45,017. As a result, the Tulloch Rule effectively requires a 
permit for all those activities, subject to a limited exception 
for ones that the Corps in its discretion deems to produce no 
adverse effects on waters of the United States.

 * * *

 The plaintiffs claim that the Tulloch Rule exceeds the 
Corps's statutory jurisdiction under s 404, which, as we have 
noted, extends only to "discharge," defined as the "addition of 
any pollutant to navigable waters." 33 U.S.C. ss 1344, 
1362(12). It argues that fallback, which returns dredged 
material virtually to the spot from which it came, cannot be 
said to constitute an addition of anything. Therefore, the 
plaintiffs contend, the Tulloch Rule conflicts with the statute's 
unambiguous terms and cannot survive even the deferential 
scrutiny called for by Chevron U.S.A., Inc. v. NRDC, 467 U.S. 
837 (1984). The "jurisdictional" character of the issue has no 
effect on the level of deference, Oklahoma Natural Gas Co. v. 
FERC, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994), as the plain-
tiffs seem to acknowledge by their silence on the subject.

 The agencies argue that the terms of the Act in fact 
demonstrate that fallback may be classified as a discharge. 
The Act defines a discharge as the addition of any pollutant 


to navigable waters, 33 U.S.C. s 1362(12), and defines "pollu-
tant" to include "dredged spoil," as well as "rock," "sand," 
and "cellar dirt." Id. s 1362(6). The Corps in turn defines 
"dredged material" as "material that is excavated or dredged 
from waters of the United States," 33 CFR s 323.2(c), a 
definition that is not challenged here. Thus, according to the 
agencies, wetland soil, sediment, debris or other material in 
the waters of the United States undergoes a legal metamor-
phosis during the dredging process, becoming a "pollutant" 
for purposes of the Act. If a portion of the material being 
dredged then falls back into the water, there has been an 
addition of a pollutant to the waters of the United States. 
Indeed, according to appellants National Wildlife Federation 
et al. ("NWF"), who intervened as defendants below, this 
reasoning demonstrates that regulation of redeposit is actual-
ly required by the Act.

 We agree with the plaintiffs, and with the district court, 
that the straightforward statutory term "addition" cannot 
reasonably be said to encompass the situation in which mate-
rial is removed from the waters of the United States and a 
small portion of it happens to fall back. Because incidental 
fallback represents a net withdrawal, not an addition, of 
material, it cannot be a discharge. As we concluded recently 
in a related context, "the nearest evidence we have of defini-
tional intent by Congress reflects, as might be expected, that 
the word 'discharge' contemplates the addition, not the with-
drawal, of a substance or substances." North Carolina v. 
FERC, 112 F.3d 1175, 1187 (D.C. Cir. 1997). The agencies' 
primary counterargument--that fallback constitutes an "addi-
tion of any pollutant" because material becomes a pollutant 
only upon being dredged--is ingenious but unconvincing. 
Regardless of any legal metamorphosis that may occur at the 
moment of dredging, we fail to see how there can be an 
addition of dredged material when there is no addition of 
material. Although the Act includes "dredged spoil" in its 
list of pollutants, 33 U.S.C. s 1362(6), Congress could not 
have contemplated that the attempted removal of 100 tons of 


that substance could constitute an addition simply because 
only 99 tons of it were actually taken away.4

 In fact the removal of material from the waters of the 
United States, as opposed to the discharge of material into 
those waters, is governed by a completely independent statu-
tory scheme. Section 10 of the Rivers and Harbors Act of 
1899, 33 U.S.C. s 403, makes it illegal "to excavate or fill" in 
the navigable waters of the United States without the Corps's 
approval. As the general counsel of the Army noted in a law 
review article published a few years after the passage of the 
Clean Water Act, Congress enacted "two separate statutory 
frameworks. Section 10 of the 1899 Act covers the act of 
dredging, while Section 404 [of the Clean Water Act] covers 
the disposal of the dredged material." Charles D. Ablard and 
Brian B. O'Neill, Wetland Protection and Section 404 of the 
Federal Water Pollution Control Act Amendments of 1972: 
A Corps of Engineers Renaissance, 1 Vt. L. Rev. 51, 93 
(1976).

 The agencies, though acknowledging that the Tulloch Rule 
effectively requires a permit for all mechanized landclearing, 
ditching, channelization or excavation in waters of the United 
States, see 58 Fed. Reg. at 45,017, locate their permitting 
requirement under s 404, not under the Rivers and Harbors 
Act's explicit coverage of "excavat[ion]." The explanation for 

__________
 4 The unreasonableness of the agencies' statutory interpretation 
was illustrated by some of the hypotheticals posed at oral argument. 
For instance, counsel for the agencies admitted that under their 
interpretation of the term "discharge" in s 301(a), it "might very 
well" be permissible to require any landowner in the United States 
wishing to cut down a tree in a wetland to obtain a s 402 permit, 
since 33 U.S.C. s 1362(6) defines "pollutant" to include "biological 
material." Oral Arg. Tr. at 22. Similarly, counsel agreed that the 
Corps could require a permit to ride a bicycle across a wetland 
under its interpretation of s 404, although bicycle-riding seems--
for now--to be exempted under the Tulloch Rule as an activity that 
does not generally destroy or degrade waters of the United States. 
Oral Arg. Tr. at 25; see 58 Fed. Reg. at 45,023 (indicating that 
"walking, grazing, vehicular traffic, and boating" would not general-
ly be regulated).


this choice is apparently that the scope of the Corps's geo-
graphic jurisdiction is narrower under the Rivers and Har-
bors Act than under the Clean Water Act, extending only to 
waters subject to the ebb and flow of the tide, or waters that 
are used, have been used, or may be susceptible for use to 
transport interstate or foreign commerce. 33 CFR s 329.4; 
see also id. s 328.1 (noting difference between geographic 
jurisdiction under the two statutes).

 There may be an incongruity in Congress's assignment of 
extraction activities to a statute (the Rivers and Harbors Act) 
with a narrower jurisdictional sweep than that of the statute 
covering discharges (the Clean Water Act). This incongruity, 
of course, could be cured either by narrowing the jurisdiction-
al reach of the Clean Water Act or broadening that of the 
Rivers and Harbors Act.5 But we do not think the agencies 
can do it simply by declaring that incomplete removal consti-
tutes addition.

 The agencies also point to some specific exemptions set 
forth in s 404(f) of the Act in support of their view that 
fallback can reasonably be said to constitute discharge. Con-
gress added the subsection in 1977, apparently in response to 
the broad construction of "discharge" in the 1977 regulations. 
It provides that "the discharge of dredged or fill material ... 
is not prohibited ... or otherwise subject to regulation" 
under the Act's permitting requirements when the discharge 
results from any of a number of specifically exempted activi-
ties, including "normal farming, silviculture, and ranching 
activities such as plowing, seeding, cultivating, [or] minor 
drainage," 33 U.S.C. s 1344(f)(1)(A), and "maintenance of 
drainage ditches," id. s 1344(f)(1)(C). After listing these 
exemptions, s 404(f) provides that a permit shall nonetheless 
be required for any activity "having as its purpose bringing 
an area of the navigable waters into a use to which it was not 

__________
 5 Of course it is conceivable that even if the statutes were 
construed to cover the same geographic jurisdiction, some activi-
ties--perhaps some kinds of mechanized landclearing--might still 
lie beyond the reach of both. Any such lacuna--as the agencies 
would clearly perceive it--would of course be simply a function of 
Congress's decisions.


previously subject, where the flow or circulation of navigable 
waters may be impaired or the reach of such waters be 
reduced." Id. s 1344(f)(2).

 The agencies claim these exemptions show that as a gener-
al matter Congress considered fallback to be covered by 
s 404. They especially note that s 404(f)(1) uses the term 
"discharge of dredged or fill material" to describe the conse-
quences of the protected activities, supposedly reflecting a 
congressional belief that fallback is a form of discharge.

 We find the exemptions far less telling. Some of the 
named activities--plowing, ditch maintenance, and the like--
may produce fallback, but they may also produce actual 
discharges, i.e., additions of pollutants, so that s 404(f) ac-
complishes a useful purpose simply by exempting them inso-
far as they produce the latter. Some others, such as seeding, 
seem to us just as unlikely to produce fallback as actual 
discharge, so we are reluctant to draw any inference other 
than that Congress emphatically did not want the law to 
impede these bucolic pursuits.

 NWF complains that our understanding of "addition" reads 
the regulation of dredged material out of the statute. They 
correctly note that since dredged material comes from the 
waters of the United States, 33 CFR s 323.2(c), any dis-
charge of such material into those waters could technically be 
described as a "redeposit," at least on a broad construction of 
that term. The Fifth Circuit made a similar observation 
fifteen years ago: " '[D]redged' material is by definition mate-
rial that comes from the water itself. A requirement that all 
pollutants must come from outside sources would effectively 
remove the dredge-and-fill provision from the statute." Avo-
yelles Sportsmen's League v. Marsh, 715 F.2d 897, 924 n.43 
(5th Cir. 1983). But we do not hold that the Corps may not 
legally regulate some forms of redeposit under its s 404 
permitting authority.6 We hold only that by asserting juris-
diction over "any redeposit," including incidental fallback, the 

__________
 6 Even the plaintiffs concede that under a broad reading of the 
term "redeposit," "a redeposit could be an addition to [a] new 
location and thus a discharge." Plaintiffs' Br. at 17.


Tulloch Rule outruns the Corps's statutory authority. Since 
the Act sets out no bright line between incidental fallback on 
the one hand and regulable redeposits on the other, a rea-
soned attempt by the agencies to draw such a line would 
merit considerable deference. Cf. Dubois v. U.S. Dep't of 
Agriculture, 102 F.3d 1273, 1296-99 (1st Cir. 1996) (although 
movement of pollutants within the same body of water might 
not constitute an "addition" for purposes of NPDES permit 
requirement, movement from one body of water to a separate 
one with different water quality is an addition). But the 
Tulloch Rule makes no effort to draw such a line, and indeed 
its overriding purpose appears to be to expand the Corps's 
permitting authority to encompass incidental fallback and, as 
a result, a wide range of activities that cannot remotely be 
said to "add" anything to the waters of the United States.

 The agencies cite opinions from several other circuits in 
support of the proposition that redeposit may be regulated 
under s 404. Because all of these decisions predated the 
Tulloch Rule, however, none addressed the fallback issue 
directly. Indeed, none of them contains any language sug-
gesting that regulation of fallback would be proper.

 In Avoyelles, for example, the Fifth Circuit held that the 
s 404 permit requirement applied to a large-scale mechanized 
landclearing project in Louisiana. Although the court held 
that "[t]he word 'addition,' as used in the definition of the 
term 'discharge,' may reasonably be understood to include 
'redeposit,' " 715 F.2d at 923, it did not consider incidental 
fallback at all. Rather, it simply held that the deliberate 
leveling of sloughs that had formerly contained rainwater, for 
the purpose of replacing an "aquatic area" with dry land, 
constituted a discharge of fill material. Id. at 924-25. (It 
did not even reach the question whether the activities were "a 
discharge of dredged material." Id. at 925.) Similarly, the 
Eleventh Circuit did not reach the fallback issue in its 
decision in United States v. M.C.C. of Florida, 772 F.2d 1501 
(11th Cir. 1985), vacated on other grounds, 481 U.S. 1034 
(1987), readopted in relevant part on remand, 848 F.2d 1133 
(11th Cir. 1988), finding instead that a construction company 
had displaced dredged spoil from the bottom of a waterway 


"onto the adjacent sea grass beds," 772 F.2d at 1506, a 
displacement that seems analytically more similar to sidecast-
ing than to fallback.7

 Perhaps the strongest authority for the agencies' position is 
Rybachek v. EPA, 904 F.2d 1276 (9th Cir. 1990). There the 
Ninth Circuit found that the Act permitted EPA to regulate 
placer mining, a process in which miners excavate dirt and 
gravel in and around waterways, and, after extracting the 
gold, discharge the leftover material back into the water. 
Rybachek held that the material separated from gold and 
released into the stream constituted a pollutant, and, to the 
extent that "the material discharged originally comes from 
the streambed itself, [its] resuspension [in the stream] may be 
interpreted to be an addition of a pollutant under the Act." 
Id. at 1285. Rybachek would help the agencies if the court 
had held that imperfect extraction, i.e., extraction accompa-
nied by incidental fallback of dirt and gravel, constituted 
"addition of a pollutant," but instead it identified the regula-
ble discharge as the discrete act of dumping leftover material 
into the stream after it had been processed. Finally, Minne-
haha Creek Watershed District v. Hoffman, 597 F.2d 617 (8th 
Cir. 1979), held simply that the construction of dams and 
riprap fall within s 404 because they involve "the placement 
of rock, sand or cellar dirt into the body of water." Id. at 
626.8

__________
 7 As for sidecasting, we note that after the briefs were submitted 
in this case a divided panel of the Fourth Circuit issued opinions 
concerning whether that activity may properly be regulated under 
the Act. Judge Niemeyer held that sidecasting does not constitute 
an "addition" within the meaning of the Act, Judge Payne held that 
it does, and Judge Luttig joined neither opinion. See Wilson, 133 
F.3d at 258-60 (opinion of Niemeyer, J.); id. at 272-75 (opinion of 
Payne, J.).

 8 In addition, our decision today is wholly consistent with Nation-
al Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982), in 


 The agencies make one last-ditch argument in defense of 
the Tulloch Rule, relying on the fact that the plaintiffs have 
raised a facial challenge to its validity. In effect, the agencies 
argue that the deferential Chevron test should be replaced in 
the context of facial attacks by an even more lenient stan-
dard--an administrative-law version of the test used by the 
Supreme Court to evaluate a facial constitutional challenge to 
a statute in United States v. Salerno, 481 U.S. 739 (1987). 
Salerno said that a "facial challenge to a legislative Act is, of 
course, the most difficult challenge to mount successfully, 
since the challenger must establish that no set of circum-
stances exists under which the Act would be valid." Id. at 
745.9 So here, argues the Corps, the Tulloch Rule must be 
upheld if any set of circumstances exists under which the rule 
would be within the Corps's statutory authority.

 If the Salerno approach applies here at all, it does so with a 
wrinkle. The plaintiffs raise a facial challenge to a 1993 
rulemaking which broadened the scope of the preexisting 
1986 regulation, but they do not deny that the earlier rule had 
valid applications. Thus, as even the Corps concedes, the 
plaintiffs' burden under a Salerno approach would be to show 
that the incremental regulation represented by the Tulloch 
Rule is invalid under every set of circumstances; to show, in 
other words, that the Corps would be acting ultra vires every 
time it required a permit under the 1993 rule that it could not 
have required under the 1986 rule.

 Once this wrinkle has been added, we are not at all sure 
that the plaintiffs fail to carry the Salerno burden. At oral 
argument, counsel for the agencies gave three examples of 
discharges to which he said the Tulloch Rule could be validly 

__________
which we held that EPA's interpretation of the term "addition" 
"must be accepted unless manifestly unreasonable." Id. at 175. 
For the foregoing reasons we find the agencies' reading of "addi-
tion" as including incidental fallback to be just that.

 9 The Salerno test does not apply in the area of First Amendment 
free speech rights, where statutes with some valid applications may 
nonetheless be struck down for overbreadth. See Salerno, 481 U.S. 
at 745.


applied but that the old rule did not cover: (1) mechanized 
landclearing, (2) fallback at various distances from the point 
of removal, and (3) resuspension of dredged material in a 
body of water. Oral Arg. Tr. at 29-30, 47-48, 102. Most 
discharges in these three categories, however, would appear 
to have been regulable by the Corps before the enactment of 
the Tulloch Rule. Subjection of mechanized landclearing to 
s 404 permit requirements was upheld pre-Tulloch, in Avo-
yelles. As for redeposits at some distance from the point of 
removal, the agencies' assertion that sidecasting has "always 
been regulated under Section 404," 58 Fed. Reg. at 45,013, 
places such conduct within the pre-Tulloch core. But see 
United States v. Wilson, 133 F.3d 251, 258-60 (Niemeyer, J.) 
(4th Cir. 1997) (summarized in note 7 above). Finally, if by 
"resuspension" counsel for the agencies was referring to 
activities like the one at issue in Rybachek (removal of dirt 
and gravel from a streambed and its subsequent redeposit in 
the waterway after segregation of gold), the pre-Tulloch rule 
clearly suffices. And if counsel meant "resuspension" to 
cover excavation or dredging accompanied by incidental fall-
back (in other words, as the agencies concede, virtually every 
act of excavation or dredging), it contradicts the statutory 
requirement of an addition.

 This leaves at most some marginal cases that might fall 
outside the scope of pre-Tulloch regulation but would still 
qualify as additions under the Act. Such cases might include 
incidental soil movements occurring in normal dredging oper-
ations that nonetheless somehow result in a transfer "be-
tween unrelated water bodies of different water quality." 
Dubois, 102 F.3d at 1297-98. We express no opinion as to 
how the Dubois concept of an addition might apply, if at all, 
to the sort of "waters" primarily at issue here, that is, 
wetlands.

 Yet we need not determine precisely how far the Tulloch 
Rule goes beyond the preexisting regulations, for we hold 
that the Salerno standard does not apply here. The Supreme 
Court has never adopted a "no set of circumstances" test to 
assess the validity of a regulation challenged as facially 
incompatible with governing statutory law. Indeed, the 


Court in at least one case, Sullivan v. Zebley, 493 U.S. 521 
(1990), upheld a facial challenge under normal Chevron stan-
dards, despite the existence of clearly valid applications of the 
regulation. The statute required the Department of Health 
and Human Services to cover all children who suffered from 
disabilities of "comparable severity" to those that would 
disable an adult, id. at 529, but HHS's rule excluded some 
who would have been considered disabled had they been 
adults. Although some of the exclusions were clearly perfect-
ly proper under the statute, the Court invalidated the rule, 
saying that "a facial challenge [was] a proper response to the 
systemic disparity between the statutory standard and 
[HHS's] approach to child-disability claims." Id. at 537 n.18.

 Our own cases confirm that the normal Chevron test is not 
transformed into an even more lenient "no valid applications" 
test just because the attack is facial. We have on several 
occasions invalidated agency regulations challenged as facially 
inconsistent with governing statutes despite the presence of 
easily imaginable valid applications. See, e.g., Health Ins. 
Ass'n of America, Inc. v. Shalala, 23 F.3d 412, 418-20 (D.C. 
Cir. 1994) (holding that agency exceeded statutory authority 
in enacting regulation concerning Medicare payment recov-
ery, because rule plainly covered some situations in which 
recovery was barred by statute).

 To be sure, the Supreme Court has recently suggested that 
it may take a more Salerno-like line on facial challenges to 
regulations. In Babbitt v. Sweet Home Chapter, Communi-
ties for a Greater Oregon, 515 U.S. 687 (1995), the Court 
upheld a regulation promulgated by the Secretary of the 
Interior interpreting the word "harm" in the Endangered 
Species Act. The Court noted that because the parties 
attacking the regulation were proceeding on a facial basis, 
"they ask us to invalidate the Secretary's understanding of 
'harm' in every circumstance," id. at 699, which the Court 
declined to do. There is no indication, however, that this 
observation in any way contributed to the result in that case. 
The Court did not sustain the regulation on the basis of a few 
hypothetical instances of valid application; instead, it held 
that the Secretary's understanding of "harm" was a reason-


able interpretation of the statute in general. See id. at 696-
708. As Justice Scalia noted in dissent, it would have been 
remarkable for the Court to find that the regulation omitted 
an element made essential by the statute, and then proceed to 
uphold the regulation against facial attack because that ele-
ment might happen to be present on the facts of a particular 
case. See id. at 731-32 (Scalia, J., dissenting). The same can 
be said here: by purporting to cover "any redeposit," the 
Tulloch Rule eschews the Act's "addition" requirement. A 
facial attack on the rule should not fail simply because the 
Corps might apply it to cases where an addition is present.

 Although we reject the agencies' proposed extension of 
Salerno, we emphasize that it is quite distinct from the 
familiar proposition that a court should reject a facial chal-
lenge, either as unripe or meritless, when the challenger's 
success turns on the assumption that the agency will exercise 
its discretion unlawfully, see, e.g., Action Alliance Of Senior 
Citizens Of Greater Philadelphia v. Heckler, 789 F.2d 931, 
941 (D.C. Cir. 1986), or will misapply the regulation, see, e.g., 
Union of Concerned Scientists v. U.S. Nuclear Regulatory 
Commission, 880 F.2d 552, 558-59 (D.C. Cir. 1989). Cf. 
Sullivan v. Everhart, 494 U.S. 83, 94 (1990) (although peti-
tioners argued that Secretary of HHS might apply statute in 
bad faith, "since that is an obvious violation of the Act it is 
... not the stuff of which a facial challenge can be construct-
ed."). The plaintiffs here rely on no such assumption. The 
problem with the Tulloch Rule is that its faithful application 
would carry the agency beyond its statutory mandate.

 There remains only the question of remedy. The agencies 
challenge the district court's issuance of a nationwide injunc-
tion ordering "that the so-called Tulloch rule is declared 
invalid and set aside, and henceforth is not to be applied or 
enforced by the Corps of Engineers or the Environmental 
Protection Agency." 951 F. Supp. at 278. The agencies 
make two arguments: first, that the plaintiffs are not entitled 
to an injunction because they presented no record evidence, 
and the district court made no explicit findings, as to the 
elements necessary for injunctive relief; and second, that 
even if the plaintiffs were entitled to an injunction the district 


court erred by granting nationwide relief to plaintiffs and 
non-parties alike.

 As for the first argument, we note at the outset that 
district courts enjoy broad discretion in awarding injunctive 
relief. See, e.g., Wagner v. Taylor, 836 F.2d 566, 575 (D.C. 
Cir. 1987). The district court was well within its discretion in 
finding that the complaint placed the agencies on notice that 
appellees sought both declaratory and injunctive relief. See 
First Amended Complaint For Declaratory and Injunctive 
Relief (filed Sept. 20, 1993), at 25-26. Although the court 
made no express findings as to the elements necessary for a 
permanent injunction (the most salient of which is the inade-
quacy of legal remedies), we do not think it was required to 
do so. Even now the agencies identify no legal remedy as 
adequate. Money damages were never sought in this action, 
and even if the government were somehow found to have 
waived its sovereign immunity against damage actions, it is 
hard to see the relevance of such remedies in the context of a 
pre-enforcement challenge to agency regulations. The plain-
tiffs did seek (and obtain) a declaration of the Tulloch Rule's 
invalidity, but this brand of relief is itself more equitable than 
legal in nature. See In re United States Brass Corp., 110 
F.3d 1261, 1267 (7th Cir. 1997); Penthouse International, 
Ltd. v. Meese, 939 F.2d 1011, 1019-20 (D.C. Cir. 1991). 
Moreover, in their summary judgment motion the agencies 
failed to argue that a declaratory judgment would be ade-
quate, or to contest any of the elements necessary for an 
injunction. And once the court reached the conclusion that 
the rule was indeed illegal (i.e., not merely that the plaintiffs 
had a reasonable probability of success on the merits, as 
would be necessary for a preliminary injunction), there was 
no separate need to show irreparable injury, as that is merely 
one possible "basis for showing the inadequacy of the legal 
remedy." 11A Wright & Miller, Federal Practice and Proce-
dure s 2944, at 94 (2d ed. 1995). In sum we do not think the 
district court was required to make explicit findings as to 
these elements before issuing its injunction.

 The agencies' argument about the breadth of the injunction 
fares no better. We have made clear that "[w]hen a review-


ing court determines that agency regulations are unlawful, 
the ordinary result is that the rules are vacated--not that 
their application to the individual petitioners is proscribed." 
Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 
1989). Justice Blackmun made a similar observation in Lu-
jan v. National Wildlife Federation, 497 U.S. 871 (1990), 
writing in dissent but apparently expressing the view of all 
nine Justices on this question:

 The Administrative Procedure Act permits suit to be 
 brought by any person "adversely affected or aggrieved 
 by agency action." In some cases the "agency action" 
 will consist of a rule of broad applicability; and if the 
 plaintiff prevails, the result is that the rule is invalidated, 
 not simply that the court forbids its application to a 
 particular individual. Under these circumstances a sin-
 gle plaintiff, so long as he is injured by the rule, may 
 obtain "programmatic" relief that affects the rights of 
 parties not before the court. On the other hand, if a 
 generally lawful policy is applied in an illegal manner on 
 a particular occasion, one who is injured is not thereby 
 entitled to challenge other applications of the rule.

Id. at 913 (Blackmun, J., dissenting) (citation omitted). See 
also id. at 890 n.2 (majority opinion) (noting that under APA, 
successful challenge by aggrieved individual can affect entire 
agency program). The agencies cite Baeder v. Heckler, 768 
F.2d 547 (3d Cir. 1985), for the proposition that a court in 
some circumstances may not order a nationwide injunction 
even after holding a regulation invalid. Baeder, however, did 
not involve a facial challenge to the validity of a regulation; 
the Third Circuit held simply that a sweeping injunction 
would not be a proper remedy "in the context of [an individu-
al plaintiff's] claim for disability benefits." Id. at 553.

 Moreover, if persons adversely affected by an agency rule 
can seek review in the district court for the District of 
Columbia, as they often may, see 28 U.S.C. s 1391(e), our 
refusal to sustain a broad injunction is likely merely to 
generate a flood of duplicative litigation. Even though our 
jurisdiction is not exclusive, an injunction issued here only as 


to the plaintiff organizations and their members would cause 
all others affected by the Tulloch Rule (or at least all those 
with enough at stake and with astute enough lawyers) to file 
separate actions for declaratory relief in this circuit. Issu-
ance of a broad injunction obviates such repetitious filings. It 
does so, to be sure, at the cost of somewhat diminishing the 
scope of the "non-acquiescence" doctrine, under which the 
government may normally relitigate issues in multiple cir-
cuits. See United States v. Mendoza, 464 U.S. 154 (1984). 
By contrast, agency defeats in other circuits cannot produce 
as severe an effect, because, although other courts can also 
issue nationwide injunctions, they need not fear a flood of 
relitigation since venue restrictions would exclude many 
would-be plaintiffs from access to the invalidating court. The 
resulting gap in the effective scope of the non-acquiescence 
doctrine appears to be no more than an inevitable conse-
quence of the venue rules in combination with the APA's 
command that rules "found to be ... in excess of statutory 
jurisdiction" shall be not only "h[e]ld unlawful" but "set 
aside." 5 U.S.C. s 706(2)(C).

 * * *

 In a press release accompanying the adoption of the Tul-
loch Rule, the White House announced: "Congress should 
amend the Clean Water Act to make it consistent with the 
agencies' rulemaking." White House Office on Environmen-
tal Policy, Protecting America's Wetlands: A Fair, Flexible, 
and Effective Approach 23 (Aug. 24, 1993). While remarka-
ble in its candor, the announcement contained a kernel of 
truth. If the agencies and NWF believe that the Clean 
Water Act inadequately protects wetlands and other natural 
resources by insisting upon the presence of an "addition" to 
trigger permit requirements, the appropriate body to turn to 
is Congress. Without such an amendment, the Act simply 
will not accommodate the Tulloch Rule. The judgment of the 
district court is

 Affirmed.



 Silberman, Circuit Judge, concurring: I join the opinion of 
the court and write separately only to make explicit what I 
think implicit in our opinion. We hold that the Corps's 
interpretation of the phrase "addition of any pollutant to 
navigable waters" to cover incidental fallback is "unreason-
able," which is the formulation we use when we have first 
determined under Chevron that neither the statutory lan-
guage nor legislative history reveals a precise intent with 
respect to the issue presented--in other words, we are at the 
second step of the now-familiar Chevron Step I and Step II 
analysis. See, e.g., Whitecliff, Inc. v. Shalala, 20 F.3d 488 
(D.C. Cir. 1994); Fedway Associates, Inc. v. United States 
Treasury, 976 F.2d 1416 (D.C. Cir. 1992); Abbott Labs. v. 
Young, 920 F.2d 984 (D.C. Cir. 1990); Associated Gas Dis-
tribs. v. FERC, 899 F.2d 1250 (D.C. Cir. 1990). As our 
opinion's discussion of prior cases indicates, the word addition 
carries both a temporal and geographic ambiguity. If the 
material that would otherwise fall back were moved some 
distance away and then dropped, it very well might constitute 
an "addition." Or if it were held for some time and then 
dropped back in the same spot, it might also constitute an 
"addition." But the structure of the relevant statutes indi-
cates that it is unreasonable to call incidental fallback an 
addition. To do so perforce converts all dredging--which is 
regulated under the Rivers and Harbors Act--into discharge 
of dredged material which is regulated under the Clean 
Water Act.

 Moreover, that Congress had in mind either a temporal or 
geographic separation between excavation and disposal is 
suggested by its requirement that dredged material be dis-
charged at "specified disposal sites," 33 U.S.C. s 1344 (1994), 
a term which simply does not fit incidental fallback.

 The Corps attempts to avoid these difficulties by asserting 
that rock and sand are magically transformed into pollutants 
once dredged, so all dredging necessarily results in an addi-
tion of pollutants to navigable waters. But rock and sand 
only become pollutants, according to the statute, once they 


are "discharged into water." 33 U.S.C. s 1362(6) (1994). 
The Corps's approach thus just leads right back to the 
definition of discharge.