**UNITED STATES of America, Plaintiff,**

v.

**BAY–HOUSTON TOWING COMPANY, INC., Defendant.**

No. 98–73252.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 14, 1999.

Joshua M. Levin, U.S. Department of Justice, Elliot M. Rockler, U.S. Department of Justice, Washington, DC, for Plaintiff.

Steven D. Weyhing, Richard Rassel, John Dudley, Detroit, MI, for Defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY DISPOSITION

COHN, District Judge.

TABLE OF CONTENTS

I.   INTRODUCTION .................................................. 598
II.  BACKGROUND .................................................... 598
     A.   Peat Harvesting Operations ............................. 598
          1.   Harvesting ........................................ 599

**598**

    2.  Haul Roads And Drainage Ditches .................................599
  B.  Permitting Activity ..............................................599
    1.  Overview ....................................................599
    2.  Minden Site .................................................600
  C.  Enforcement Activity ............................................600

III.  STANDARD ...........................................................601

IV.  COUNT I .............................................................601

V.  COUNT II ............................................................601
  A.  REGULATORY SCHEME ........................................602
    1.  Statute .....................................................602
    2.  Regulation ..................................................602
    3.  National Mining Association .................................603
  B.  "DISCHARGE" ..................................................604
    1.  Overview ....................................................604
    2.  The Tulloch Rule ...........................................605
    3.  Temporary Redeposit .......................................607
  C.  "FILL MATERIAL" ..............................................607

VI.  CONCLUSION .........................................................608

## I. INTRODUCTION

This is an environmental action brought by the United States at the request of the Environmental Protection Agency (EPA) pursuant to § 309 of the Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq.* The United States seeks injunctive relief and civil penalties relating to Defendant Bay–Houston Towing Company, Inc.'s (Bay–Houston) peat harvesting[1] activities in Minden Township, Sanilac County, Michigan. The United States claims that Bay–Houston, through its Michigan Peat division, has: discharged pollutants via peat bog drainage water through six separate ditch outfalls into the Black River Drain without a permit under section 402 of the CWA (Count I); "discharged" dredged or "fill material" into wetlands without a permit under section 404 of the CWA (Count II); and violated an administrative compliance order issued by the EPA under section 309 of the CWA, requiring that Bay–Houston cease unpermitted discharges and submit a wetlands restoration plan (Count III).

Now before the Court is Bay–Houston's motion for summary judgment with respect to Counts I and II only. Bay–Houston argues that Count I is moot because on July 24, 1998, the Michigan Department of Environmental Quality (MDEQ) issued it a National Pollutant Discharge Elimination System (NPDES) permit under section 402 of the CWA authorizing the discharge of peat bog drainage water into the Black River. As to Count II, Bay–Houston asserts that its peat harvesting operation does not amount to a "discharge" or "addition" to wetlands and therefore does not fall within the government's jurisdiction under section 404 of the CWA, citing a recent decision of the United States Court of Appeals for the D.C. Circuit. *National Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C.Cir.1998).[2] The Court held a hearing on the motion on November 18, 1998. For the reasons that follow, the motion will be denied.

## II. BACKGROUND

### A. Peat Harvesting Operations [3]

Bay–Houston owns two non-contiguous parcels of land in Minden Township, individu-

---

**1.** There is no single word which defines a commercial peat operation. In the record the activity is variously referred to as harvesting, mining, extracting and excavating. For consistency's sake, the activity will be referred to throughout as harvesting.

**2.** In its papers, the United States states its belief that the facts support partial summary judgment in its favor and that it intends to file an appropriate motion in the future.

**3.** For a general discussion of peatlands and peat, see the International Peat Society's internet website located at <http://www.peatsociety.fi>.

ally referred to as Minden North and Minden South (collectively, Minden Site). Bay–Houston has continuously harvested peat from a part of the Minden North site since 1958. .

### 1. *Harvesting*

Generally, peat harvesting involves the removal of peat moss by first clearing surface vegetation in a bog area and allowing the exposed peat to dry in the sun. Once dried, the peat moss is harvested and bagged, to be sold for horticultural purposes. Bay–Houston harvests three types of commercial peat. Sphagnum peat constitutes the upper most layer of the peat deposit. The second two layers are known commercially as horticultural peat and reed/sedge peat.

After the surface vegetation is cleared from an area being harvested, sphagnum peat is harvested by discing the area with a farming disc, and then vacuuming the loosened sphagnum peat with a vacuum harvester and depositing it at the side of a field into a temporary harvest windrow. Horticultural peat and reed-sedge peat are harvested by using a bulldozer to push the next layers of peat material across the field into temporary harvest windrows.

The temporary harvest windrows measure as much as 30 feet wide, 12–14 feet tall, and several hundred feet long. Their foundation is comprised of woody surface vegetation cleared from intended harvesting areas of the bog using a brush hog mower, a machine comparable to a "very large lawnmower." The peat material is stored in the temporary harvest windrows before being transported by truck to the packaging plant along adjacent haul roads.

### 2. *Haul Roads and Drainage Ditches*

Bay–Houston constructed haul roads on the bog using materials found within the bog. The woody surface vegetation from the bog was used as a foundation for the harvest windrows as well as a foundation for the haul roads. The foundation for the haul roads was topped with sand, gravel, and clay, and then smoothed. The haul roads measure approximately 36 to 42 inches in height, *i.e.* 18 inches of vegetation topped by 18–24 inches of clay and sand. Bay–Houston built the last haul road in 1985. It maintains the haul roads on an as needed basis by using materials from the bog to fill in holes that develop in the road surface and to smooth washboard areas. According to Bay–Houston the haul roads are temporary, though none have been removed to date.

Prior to 1976, Bay–Houston excavated a network of in-field drainage ditches to lower the water table in an area of the bog to be harvested to enable the peat to dry in the sun. The ditches reach depths of up to 14 feet. In excavating the ditches, Bay–Houston used backhoes, excavators and Dondi ditching machines [4] to dig into the peat and clay layers of the bog. The excavated peat and clay were deposited onto the side of the ditches. The excavated peat was later spread into other areas of the bog for future harvest and the excavated clay was used to build the haul roads. Bay–Houston excavated the last ditch in 1976. It maintains the ditches by removing any fallen plant material or peat, placing it alongside the ditch, and then spreading it into the bog.

### B. *Permitting Activity*

### 1. *Overview*

With the objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," the CWA prohibits the "discharge of any pollutant," § 301(a), including "dredged spoil," "biological materials," "rock," and "sand," § 502(6), except by permit, §§ 402 and 404.

Under section 402 of the CWA, discharges of pollutants other than "dredged or fill material" into navigable waters of the United States may be authorized by a permit issued by EPA or a state with delegated authority in accordance with NPDES. § 402(b). Discharges of "dredged or fill material" into

---

4. Dondi machines rotate a series of bucket blades on a large wheel. As the blade rotates, each bucket excavates. A ditch is created as the machine crawls forward. The excavated material is transferred from the buckets to the side of the ditch through the use of a "trough with an auger type mechanism."

navigable waters of the United States may be authorized under section 404 of the CWA by a permit issued by the U.S. Army Corps of Engineers ("Corps") or a state with delegated authority. § 404(g). Michigan has acquired permission to administer its own section 402 and 404 NPDES permit programs. Section 309(a)(3) and (b) of the CWA authorizes the Administrator of the EPA to issue an order requiring compliance or to commence a civil action in federal district court for appropriate relief, including a temporary or permanent injunction and/or an assessment of a civil penalty, when he or she finds that any person is in violation of sections 301(a), 402 and/or 404 of the CWA.

### 2. *Minden Site*

In July 1991, the Michigan Department of Natural Resources, as state enforcer of the section 402 and 404 permit programs, informed Bay–Houston that it needed a permit to continue to harvest peat. Bay–Houston thereafter filed section 402 and 404 permit applications seeking permission to discharge dredged or fill material into wetlands, and specifically to "[clear] acreage of surface vegetation, [prepare] the peat moss surface for solar drying by discing, and [remove] the dried peat moss surface for storage in windrows prior to screening and bagging for horticultural peat moss-based products." Bay–Houston also sought to expand its peat mining operations to Minden South.[5]

Ultimately, the MDEQ issued Bay–Houston a "state only" permit in June 1997 to conduct dredge and fill activities. The MDEQ noted that continued objections of the EPA precluded the state from authorizing the project, and that under the provisions of Section 404 of the CWA, Bay–Houston could seek federal authorization directly from the U.S. Army Corps of Engineers. Bay–Houston then sued the United States, the EPA and the Regional Administrator of Region V of the EPA, as well as the State of Michigan, the MDEQ, and its director, Russell J. Harding, seeking to enjoin the EPA and the MDEQ from exercising oversight or enforce-

ment authority in conjunction with Bay–Houston's attempts to obtain a permit. *See, Michigan Peat v. EPA, No. 97-72336*, filed May 16, 1997.

On February 4, 1998, during the pendency of the suit, the EPA issued a compliance order stating that Bay–Houston was discharging pollutants into Minden Bog without a permit. The EPA ordered Bay–Houston to cease and desist such actions, to propose a remediation plan, and to submit an after-the-fact permit application to the Corps. The order also noted that violating the terms of the Order "may result in U.S. EPA taking enforcement action regarding those Order violations . . . ."

On May 11, 1998, the Court dismissed Bay–Houston's action on the ground that the state defendants were protected by Eleventh Amendment Immunity, and that absent a final agency action the Court lacked jurisdiction over the EPA's decision denying the permit. *Michigan Peat v. Regional Adm'r of Region V of U.S. EPA*, 7 F.Supp.2d 896, Memorandum and Order Granting Motion to Dismiss (E.D.Mich. May 11, 1998) ("under the CWA, 'judicial review of pre-enforcement orders' by the EPA 'is not available.' ").[6]

### C. *Enforcement Activity*

The government brought this enforcement action on June 29, 1998. The Complaint alleges that Bay–Houston is conducting the following activities in violation of the CWA:

I: Discharging pollutants via peat bog drainage water through six separate ditch outfalls into the Black River Drain without an NPDES permit under § 402 of the CWA;

II: Discharging dredged or fill material into wetlands without a permit under § 404 of the CWA; and,

III: Violating the EPA administrative compliance order issued under § 309(a) of the CWA.

The government seeks the following relief:

1. An injunction requiring Bay–Houston to immediately cease further discharg-

---

**5.** Bay–Houston withdrew its application in January 1993 in order to prepare a comprehensive environmental assessment, and filed a second application in 1994.

**6.** The decision is currently on appeal. Bay–Houston did not operate in the Minden Site during the 1998 season.

es of pollutants into the Black River Drain, except in compliance with an NPDES permit issued pursuant to § 402;

2. An injunction requiring Bay–Houston to immediately cease further discharges of dredged or fill material into the wetlands on the Minden Site, except in compliance with a permit issued pursuant to § 404;

3. An injunction requiring Bay–Houston to submit to the EPA for approval a plan to restore the wetlands at the Minden Site that have been affected by Bay–Houston's unlawful discharges;

4. An injunction requiring Bay–Houston to restore the wetlands that have been affected by Bay–Houston's discharges of pollutants to their original contours in accordance with a plan approved by EPA; and

5. Civil penalties for each day of violation at the Minden Site of not more than $25,000 per day for each violation, § 309(d), including the inflation adjustment for civil penalties for violations occurring after January 31, 1997. 61 Fed.Reg. 69,360, 69361 (Dec. 31, 1996).

On July 24, 1998, the MDEQ issued, and Bay–Houston agreed to, an NPDES § 402 permit authorizing the discharge of peat bog drainage water into the Black River through three outfalls. This permit is based on Bay–Houston's March, 1995 application. The government does not challenge the issuance of the permit.

### III. STANDARD

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir.1995).

### IV. COUNT I

■ As to Count I, Bay–Houston argues that the MDEQ's issuance of an NPDES section 402 permit renders the claim moot. The government concedes that a permit has been issued, but argues that the claim is not moot because the injunctive relief sought would require Bay–Houston to "reduce the number of outfalls that discharge pollutants to the Black River and comply with other requirements contained in the permit."

The Complaint asks the Court to "[r]equire the Defendant to immediately cease further discharges of pollutants into the Black River Drain, except in compliance with an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342." This allegation is sufficient to require the Court to review Bay–Houston's compliance with the permit. While the Court must review other alleged violations of the permit, however, it cannot issue an anticipatory injunction in the event that Bay–Houston may violate the permit. The claim under Count I is limited to specified violations of the permit identified by the government within 60 days of this Memorandum and Order.

### V. COUNT II

Bay–Houston seeks summary judgment as to Count II based on the decision in *National Mining, supra*. In that case the Court of Appeals for the District of Columbia Circuit held that the Corps lacks authority under section 404 of the CWA to regulate the redeposit of dredged materials that incidentally "fall back" in the course of dredging operations. 145 F.3d at 1404. Bay–Houston asserts that its operations consist of the removal of peat from the bog accompanied by

incidental fallback, which the CWA does not regulate, and not the "addition" of material to the bog, which is regulated by the CWA. Bay–Houston also argues that its operations do not involve the discharge of "fill material" because the peat it harvests and the operations it conducts do not have either the purpose or effect of "replacing an aquatic area with dry land."

### A. Regulatory Scheme

#### 1. Statute

The CWA prohibits the "discharge of any pollutant," except by permit. § 301. The phrase "discharge of pollutants" is defined to mean "any addition of any pollutant to navigable waters from any point source." § 502(12). A "point source" is "any discernable, confined and discrete conveyance, including but not limited to any ... ditch, channel ... container [or] rolling stock ... from which pollutants are or may be discharged." § 502(14). "Pollutant" is defined broadly to include, inter alia, "dredged spoil," "biological materials," "rock," and "sand." § 502(6). The term "navigable waters" encompasses all "waters of the United States, including the territorial seas," § 502(7), and has been construed to include wetlands, United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131–32 & n. 8, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), i.e., areas that are "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 40 C.F.R. §§ 230.3(s), 232.2 (EPA regulations); 33 C.F.R. § 328.3(b) (Corps regulations). "Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b).

#### 2. Regulation

In 1977, the Corps issued regulations defining "discharge of dredged material" as essentially "any *addition* of dredged material into the waters of the United States." 42 Fed.Reg. 37,145 (July 19, 1977) (emphasis added). In 1986, the Corps issued a regulation excluding from this definition "de minimis, incidental soil movement occurring during normal dredging operations." 33 C.F.R. § 323.2(d) (1990). "[T]he agencies did not regulate removal of material from waters, such as landclearing, ditching and channelization, even if those activities might have adversely impacted wetlands or waters." American Min. Congress v. U.S. Army Corps of Engineers, 951 F.Supp. 267, 269 (D.D.C.1997). The preamble of the regulation states:

> Section 404 clearly directs the Corps to regulate the discharge of dredged material, not the dredging itself. Dredging operation cannot be performed without some fallback. However, if we were to define this fallback as a "discharge of dredged material," we would, in effect, be adding the regulation of dredging to section 404 which we do not believe was the intent of Congress. We have consistently provided guidance to our field offices since 1977 that incidental fallback is not an activity regulated under section 404. The purpose of dredging is to remove material from the water, not to discharge material into the water. Therefore, the fallback in a "normal dredging operation" is incidental to the dredging operation and de minimis when compared to the overall quantities removed.

> \* \* \* \* \* \*

> However, we wish to also make it clear that this provision applies only to the incidental fallback occurring during "normal dredging operations" and not to the disposal of the dredged material involved. If this material [the material being dredged] is disposed of in a water of the United States, by sidecasting or by other means, this disposal will be considered to be a "discharge of dredged material" and will be subject to regulation under section 404.

51 Fed.Reg. 41210 (1986).

In 1993, a lawsuit filed by an environmental group prompted the Corps to regulate incidental fallback. In *North Carolina Wild Life Federation v. Tulloch*, Civ. No. C90–713–CIV–5–BO (E.D.N.C.1992), the Corps initially determined that a developer's draining and clearing of 700 acres of wetlands involved only minimal incidental releases of soil and other dredged material, and did not require a § 404 permit. To prevent

more than incidental fallback, the developer used techniques such as welding shut openings in equipment and using dump trucks to transport soil removed by backhoes. In settling the lawsuit, the Corps agreed to "clarify that mechanized landclearing, ditching, channelization, and other excavation activities" constitute "discharges of dredged material," and "that these activities would be regulated under section 404 of the CWA when they have or would have the effect of destroying or degrading waters of the United States, including wetlands." 58 Fed.Reg. 45008. The result is that the Corps issued a regulation removing the de minimis exception and expanding the definition of discharge to cover:

> "[a]ny addition, including any redeposit, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation."

33 C.F.R. § 323.2(d)(1)(iii); *see* 40 C.F.R. § 232.2(1)(iii) for parallel rule promulgated by EPA. This is known as the "Tulloch Rule." Under it, a permit is required "for an activity that would not destroy or degrade waters of the U.S. because it would have only a de minimis effect on such waters." Thus, the rule focused on the effect of a discharge and placed the burden on the discharger to demonstrate that its mechanized landclearing, ditching, channelization and other excavation activity would not destroy or degrade waters of the United States.

### 3. *National Mining Association*

Mining organizations and others brought a facial challenge to the agencies' regulation of incidental fallback through the Tulloch Rule, principally arguing that "by defining a 'discharge' to mean an 'addition,' Congress in-

tended to regulate only the introduction or placement of dredged material into water, and not the incidental fallback that accompanies the removal of material from waters." *American Mining Congress, supra,* 951 F.Supp. at 272. The district court agreed, analyzing the regulation under the two-step procedure set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[7] The court described incidental fallback as "the incidental soil movement from excavation, such as the soil that is disturbed when dirt is shoveled, or the back-spill that comes off a bucket and falls back into the same place from which it was removed." *Id.* at 270. It distinguished this from "soil movements away from the original site" such as "placing removed soil alongside a ditch, and sloppy disposal practices involving significant discharges into waters" which "have always been subject to § 404." *Id.* at n. 4. The district court held that the regulation's coverage of incidental fallback was unreasonable. 951 F.Supp. at 271.

On appeal, the D.C. Circuit affirmed this decision, stating:

> We agree with the plaintiffs, and with the district court, that the straightforward statutory term "addition" cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back. Because incidental fallback represents a net withdrawal, not an addition, of material, it cannot be a discharge. As we concluded recently in a related context, "the nearest evidence we have of definitional intent by Congress reflects, as might be expected, that the word 'discharge' contemplates the addition, not

---

7. In *Chevron,* the Supreme Court said:

    When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly ad-

    dressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

    *Id.* at 842–43, 104 S.Ct. 2778.

the withdrawal, of a substance or substances."

145 F.3d at 1403 (citations omitted). The court rejected the agencies' primary argument that incidental fallback constitutes an "addition" because once dredged the material becomes a pollutant:

> Regardless of any legal metamorphosis that may occur at the moment of dredging, we fail to see how there can be an addition of dredged material when there is no addition of material. Although the Act includes "dredged spoil" in its list of pollutants, Congress could not have contemplated that the attempted removal of 100 tons of that substance could constitute an addition simply because only 99 tons of it were actually taken away.

145 F.2d at 1404 (citations omitted). The court further noted that "the act of removal of material from the waters of the United States, as opposed to the discharge of material into those waters, is governed by a completely independent statutory scheme," referring to the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which makes it illegal "to excavate or fill" in the navigable waters of the United States without the Corps' approval. *Id.*

The court distinguished incidental fallback from discharges regulated prior to the Tulloch Rule. For example, in *Rybachek v. U.S. E.P.A.*, 904 F.2d 1276, 1285 (9th Cir.1990), the Ninth Circuit held that placer mining, "a process in which miners excavate dirt and gravel in and around waterways, and, after extracting the gold, discharge the leftover material back into the water," fell within the scope of § 404. 145 F.3d at 1406. The court in *National Mining* distinguished *Rybachek* on the ground that rather than "imperfect extraction," the regulable discharge in *Rybachek* was "the discrete act of dumping leftover material into the stream after it had been processed." *Id.* A concurring opinion in *National Mining* specified that the court's decision was a narrow one:

> *As our opinion's discussion of prior cases indicates, the word addition carries both a temporal and geographic ambiguity. If the material that would otherwise fall back were moved some distance away and then*

*dropped, it very well might constitute an "addition." Or if it were held for some time and then dropped back in the same spot, it might also constitute an "addition."* But the structure of the relevant statutes indicates that it is unreasonable to call incidental fallback an addition. To do so perforce converts all dredging-which is regulated under the Rivers and Harbors Act-into discharge of dredged material which is regulated under the Clean Water Act.

> Moreover, that Congress had in mind either a temporal or geographic separation between excavation and disposal is suggested by its requirement that dredged material be discharged at "specified disposal sites," 33 U.S.C. § 1344 (1994), a term which simply does not fit incidental fallback.

*Id.* (emphasis added).

### B. *"Discharge"*

#### 1. *Overview*

The government identifies the following four activities of Bay–Houston as being regulated by the Act:

1. The use of mechanized landclearing equipment to move dredged peat, clay and vegetation to the side of the ditch in the course of excavating and maintaining drainage ditches;

2. The use of mechanized landclearing equipment to spread the excavated peat from the side of the ditch onto the bog for future harvest;

3. The use of mechanized landclearing equipment to disc the wetland fields, to push peat across the fields, and to pile peat into temporary harvest windrows; and,

4. The creation of haul roads, and use of large vegetation to create the foundation for temporary harvest windrows.

Bay–Houston asserts that as a matter of law these activities do not constitute regulable "discharge" because (1) the activities identified by the government were excluded from regulation in National Mining, and (2) even if the activities exceed the scope of the protect-

ed activity in *National Mining*, they are similarly incidental to removal because material is only temporarily deposited into the bog as one of several stages in its ultimate removal.

### 2. *The Tulloch Rule*

The record is sufficient to enable a reasonable person to conclude that this case has nothing to do with the Tulloch Rule because the activities identified by the government are very different from incidental fallback. Unlike incidental fallback, these activities involve purposeful relocation. In contrast to "the soil that is disturbed when dirt is shoveled, or the back spill that comes off a bucket and falls back into the same place from which it was removed," 951 F.Supp. at 270, Bay–Houston removes materials from the bog and, after a varying period of time, deliberately redeposits the materials in other locations within the bog at varying distances.[8]

The court in *National Mining* made the distinction between incidental fallback and activities such as Bay–Houston's in its discussion of the pre-Tulloch Rule cases and in the concurring opinion. In digging the ditches, Bay–Houston purposefully moved bog materials to the side of the ditch.[9] This is categorized as sidecasting which, as the district court in *National Mining* stated, "has always been subject to § 404." 951 F.Supp. at 270 n. 4. " 'Sidecasting' involves placing removed soil in a wetland but at some distance from the point of removal (e.g., by the side of an excavated ditch)." *National Mining*, 145 F.3d at 1402. The preamble to the *Tulloch* rule explains that it was not an "abrupt" change from past practice because, although the district offices acted inconsistently, the Corps had been regulating "many projects involving mechanized landclearing,

ditching, channelization, mining, or other activities," including sidecasting:

> For example, many drainage ditches in wetlands traditionally have been dug by sidecasting the excavated material into the wetlands; those activities have always been regulated under § 404. Similarly, many channelization, mining, and other excavation activities in U.S. waters have been regulated under Section 404 over the years, because they involved substantial discharges through disposal or stockpiling of the excavated material in waters of the U.S., or "sloppy" excavation practices, or other substantial discharges.

58 Fed.Reg. 45013 (Aug. 25, 1993).

Bay–Houston cites *United States v. Wilson*, 133 F.3d 251 (4th Cir.1997), in which a divided panel of the Fourth Circuit issued opinions concerning whether sidecasting may be regulated under section 404. Judge Niemeyer held that sidecasting does not constitute an "addition" within the meaning of the Act, Judge Payne held that it does, and Judge Luttig joined neither opinion. In finding that the movement of native wet soils a few feet to the side of the ditch being created does not constitute an "addition," Judge Niemeyer reasoned that " '[a]ddition' requires the introduction of a new material into the area, or an increase in the amount of a type of material which is already present." *Id.* at 259. Judge Payne disagreed, stating:

> As the regulatory history explains and as was true here, dredging or excavating, whether in the bed of a river or in a wetland, involves disturbing the soils into which the excavation or dredge reaches. When the extracted material is moved, its contents are released in the waters into

---

8. The only activity which appears to fall outside of this category would be the vacuuming of sphagnum peat. The government has not, however, included this activity among those it seeks to regulate.

9. The government has not addressed whether it is focusing solely on the maintenance of these ditches or the creation of the ditches as well, and if the latter, how the length of time that has passed since the creation of the ditches affects the government's authority. In a footnote in its reply brief, Bay–Houston cites 28 U.S.C. section 2462, which states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

The Court will not review this issue until it is fully presented.

which that material is placed (whether deep water as in a river channel or shallow water as in the wetlands at issue here). The contents of the excavated or dredged material then becomes a part of the receiving water to which the extracted material is added. And, the formerly buried material (from the excavation or dredge) is united with the nearby surface of the bottom or wetland where it is deposited following excavation or dredging.

Hence, according to the usual meaning of the term "addition," the sub-surface material extracted by the excavation or dredging is added to the water and to the surface material into which the sub-surface material is deposited upon the act of sidecasting. Whether that which is thusly discharged is highly toxic kepone laying a few inches beneath the silted over bed of the James River or perhaps not so toxic fertilizer, biological material, rocks, or sand from the bottom of a wetland, a pollutant is added to the waters.

133 F.3d at 273 (Payne, J. concurring). The Court finds the reasoning of Judge Payne to be the more persuasive. In *National Mining*, the Court did not limit the Corps' jurisdiction to activities involving the introduction of foreign material into the environment:

> NWF complains that our understanding of "addition" reads the regulation of dredged material out of the statute. They correctly note that since dredged material comes from the waters of the United States, 33 CFR § 323.2(c), any discharge of such material into those waters could technically be described as a "redeposit," at least on a broad construction of that term. The Fifth Circuit made a similar observation fifteen years ago: " '[D]redged' material is by definition material that comes from the water itself. A requirement that all pollu-

tants must come from outside sources would effectively remove the dredge-and-fill provision from the statute." *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 924 n. 43 (5th Cir.1983). But we do not hold that the Corps may not legally regulate some forms of redeposit under its § 404 permitting authority. We hold only that ·by asserting jurisdiction over "any redeposit," including incidental fallback, the Tulloch Rule outruns the Corps's statutory authority.

145 F.3d at 1405; *see also, Rybachek, supra* (placer mining falls under § 404), citing *Avoyelles, United States v. M.C.C. of Florida, Inc.*, 772 F.2d 1501, 1506 (11th Cir.1985)(action of digging up sediment and redepositing it on seat bottom by boat propellers constitutes an addition of pollutants), *vacated and remanded on other grounds*, 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 809 (1987), *readopted in part and remanded on other grounds*, 848 F.2d 1133 (11th Cir.1988), *reh'g granted in other part*, 863 F.2d 802 (11th Cir.1989). Indeed, the plaintiffs in that case conceded that a "redeposit" could be an addition of native materials to a new location and thus a discharge. 145 F.3d at 1404, n. 6.[10]

Spreading the sidecasted bog material from the side of the ditch into the bog for future harvest also involves relocating the bog materials, and for a period of time varying from "a few hours" to "a few days." *See United States v. Huebner*, 752 F.2d 1235, 1242 (7th Cir.1985) (use of bulldozers to spread material excavated from ditch over several acres of wetland constituted a "discharge of dredged material onto a wetland"). Therefore, like sidecasting, this activity could constitute an "addition."

■ The same is true of discing. Although in a more limited manner, this activi-

10. The other cases Bay–Houston cites do not support the position that only foreign materials may constitute an addition. *See Froebel v. Meyer*, 13 F.Supp.2d 843 (E.D.Wis.1998) (§ 402 does not govern activity in which "silt and sediment—itself not actually dredged, excavated, or otherwise mechanically disturbed—is redeposited over time due to the natural movement of water through a . . . partially removed dam"), and *National Wildlife Fed. v. Consumers Power Co.*, 862 F.2d 580 (6th Cir.1988) (court accepted as rea-

sonable government's position that dams are excluded from regulation under § 402 unless material from the outside world is introduced into water, and held that § 402 did not govern hydroelectric pumped-storage facility's redirection of water containing fish). Both concern regulation of the passage of water under § 402, not dredged or fill material under § 404. *See, Froebel*, 13 F.Supp.3d at 865–66 (distinguishing the meaning of "addition" in the context of § 402 and § 404).

ty also entails deliberately displacing bog materials. In *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983), the court described the defendant's discing activities as follows:

> After the shearing, windrowing and chunk raking the land was disced to prepare it for soybean cultivation. A disc is a bowl-shaped blade that cuts into the ground and fluffs the soil up. The disc's [sic] used on this tract were 24 inches in diameter and would cut into the ground approximately 9 inches. During discing, some soil would ride in front of the disc and would be redeposited in other areas of the tract, resulting in substantial displacement and redepositing of the soil itself.

*Id.* at 921, quoting, *Avoyelles Sportsmen's League v. Alexander*, 473 F.Supp. 525, 529 (W.D.La.1979). The Fifth Circuit agreed with the district court that the landowners' redepositing activities would significantly alter the character of the wetlands and limit the vital ecological functions served by the tract, and constituted a discharge within the meaning of the CWA. 715 F.2d at 923–24. Here, the facts as presented thus far are sufficient to raise a triable issue as to whether discing, and the other activities identified by the government, constitute a regulable "discharge" under the CWA.

### 3. *Temporary Redeposit*

Bay–Houston argues that the activities the government has identified as resulting in a "discharge" actually constitute removal because any displaced material is ultimately removed. Bay–Houston argues: (1) the peat product from the drainage ditch was subsequently removed from the property, packaged and sold, thus Bay–Houston neither discharged nor added any new material into the property, and (2) the windrows are temporarily created solely to facilitate the removal of material from the bog and are hauled away by truck to the packaging plant, thus Bay–Houston neither discharged nor added any new material into the property

■ Whether Bay–Houston's activities may be categorized as "discharges" when the bog material is only temporarily displaced into other areas of the bog before being removed from the bog raises a genuine issue of material fact. A factfinder could conclude that a redeposit is made at each of the four stages identified by the government as discussed above, and that this occurrence is not negated by the ultimate removal of the redeposited material.

■ In regard to the creation of haul roads, Bay–Houston argues that the roads were constructed solely for the purpose of moving mining equipment for the company's peat harvesting operations, and the CWA specifically provides that "the discharge of dredged or fill material" for "the purpose of construction or maintenance of farm roads or forest roads, *or temporary roads for moving equipment*" is "not prohibited or otherwise subject to regulation." 33 U.S.C. § 1344(f)(1)(E) (emphasis added). Whether the roads are temporary is a question of fact. As pointed out by Bay–Houston, the last road was built in 1985 and, as pointed out by the government, none of the roads has been abandoned to date.

### C. *"Fill Material"*

Bay–Houston also seeks summary judgment on Count II as to the question of whether it has discharged "fill material." The agencies define this term as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." 33 C.F.R. § 323.2(e) (Corps) and 40 C.F.R. § 232.2(EPA). The regulations specify that the term "generally includes, without limitation, ... placement of fill that is necessary for the construction of any structure in a water of the United States; the building of any *structure* or *impoundment requiring* rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills ...." 33 C.F.R. § 323.2(e).[11]

---

11. 33 C.F.R. section 323.2(e) states:

"The term discharge of fill material means the addition of fill material into waters of the

United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the con-

608

The government argues, and the Court agrees, that Bay–Houston's use of indigenous bog vegetation and clays to create haul roads and windrow foundations can constitute the discharge of "fill materials" under the Act. *See Avoyelles*, 715 F.2d at 924–25 (leveling indigenous material in wetlands constitutes "discharge of fill").

## VI.  *CONCLUSION*

For the reasons stated above, Bay–Houston's motion for summary judgment is DE-NIED.

SO ORDERED.[12]

struction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other sues; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs."

12.  Bay–Houston conducts peat harvesting operations in Cromwell, Minnesota under a section 404 permit issued by the Corps in 1996.  In light of this, the Court is satisfied that the parties should be able to agree on a form of section 404 permit which will allow Bay–Houston to continue its peat harvesting operations at the Minden Site.